MARGARET TIGHE AND RICK TIGHE, WIFE AND HUSBAND, APPELLANTS, V. CEDAR LAWN, INC., APPELLEE.

649 N.W.2d 520

Filed July 2, 2002.   No. A-01-562.

David W. Jorgensen, of Nye, Hervert, Jorgensen & Watson, P.C., for appellants.

Daniel L. Lindstrom and Trent W. Steele, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellee.

HANNON, SIEVERS, and MOORE, Judges.

SIEVERS, Judge.

Margaret Tighe (Maggie) fell into a wellhole, which was covered with a deteriorated plywood cover, on premises she and her husband, Rick Tighe, leased from Cedar Lawn, Inc. Maggie sued Cedar Lawn for her injuries in the district court for Buffalo County, Nebraska. Rick sued for loss of consortium. Holding that the Tighes failed to establish that Cedar Lawn owed them a duty, the court granted a directed verdict in Cedar Lawn's favor.

## FACTUAL BACKGROUND

In 1986, Maggie and Rick leased a residence from Cedar Lawn approximately 10 miles northeast of Kearney, Nebraska. Although the Tighes made their rent payable to Cedar Lawn, for practical purposes we will refer in this opinion to Andrew Howe and his wife as the Tighes' landlords. Andrew is the president of Cedar Lawn.

The Tighes lived in the Cedar Lawn residence from 1986 until 1997, and their original lease, in evidence as exhibit 21,

was never altered during that 11-year period. The lease included "[t]he house and garage, lawn, and garden," and the Tighes were required to "cut and water said lawn and keep weeds cut on the premises, and maintain said yard in a neat, orderly condition at all times." The lease also required the Tighes to "maintain and keep said property in a good state of repair." Cedar Lawn agreed to "pay for major repairs or maintenance that [had] written prior approval" by Cedar Lawn.

According to the lease, if "improvements" on the property became "untenantable by reason of extensive damage or destruction," Cedar Lawn had the "sole option [of] electing whether to repair, replace or remodel said property to its prior condition." Finally, a lease provision required the Tighes to "hold [Cedar Lawn] harmless from any and all damages to property or injury or death to person . . . on the leased premises resulting from the negligence or carelessness of the [Tighes]."

The south yard of the house contains a wellhole between 5 and 6 feet deep, with a gravel and dirt bottom and brick sides. The wellhole is surrounded at the top by a concrete pad approximately 54 inches in diameter. The testimony is somewhat unclear on the wellhole's precise shape, but it appears that the plywood cover placed over the hole was shaped somewhat like a "square" frying pan, with the "pan" measuring approximately 18 by 21 inches and the "pan handle" measuring approximately 12½ by 7½ inches. The wellhole, approximately 2 inches smaller in diameter than the cover, contains two small pressure tanks measuring approximately 12 inches in diameter and 3 feet tall, a pressure gauge, a pressure switch, and circuit breaker controls. The equipment in the wellhole is connected to a submersible well approximately 17 feet away. Andrew placed this equipment in the wellhole "because the hole was there."

Andrew testified that every 2 years, he routinely filled the pressure tanks to keep the water system running smoothly. When he filled the tanks, he checked the condition of the wellhole's plywood cover. If the cover was in "bad condition," Andrew replaced it with a new one which he cut from ¾-inch exterior grade plywood and to which he applied several coats of sealant with stain to protect against moisture. Andrew testified that he never asked the Tighes to replace the wellhole cover and

that throughout the term of the Tighes' lease, all work on the well and the wellhole cover was performed by him or at his direction. The Tighes agree that it was Andrew's responsibility to maintain the well. Andrew testified that the last time he replaced the cover before Maggie's accident was in 1994.

For winter, Andrew would place 8 to 10 straw bales over the wellhole to insulate the pump. At some point during their tenancy, the Tighes began putting the straw bales over the wellhole in the fall and removing them in the spring. It is unclear from the record whether Andrew requested the Tighes to do this job or whether the Tighes volunteered. Maggie testified that at least twice a year, when the Tighes placed and removed the straw bales, she got a good look at the wellhole cover. She testified that the bales usually got wet during the winter and that she noticed that the cover was splintered and "very moist underneath those . . . bales when [the Tighes] removed them."

The lease required the Tighes to maintain the lawn, and when Maggie mowed, she noticed "several different times" that the wellhole cover was deteriorating. Maggie testified that because neither her riding mower nor her push mower would fit between the wellhole and a nearby fence, she always had to "go in and pull the weeds out between the fence . . . and the well." However, she "never walked on that wooden well cover." Maggie stated, "I didn't trust it" and "I did not feel safe with that well." Maggie testified that she advised the Tighes' landlords "several times" of the cover's condition. She specifically remembers telling them at the end of March or beginning of April 1996, when she delivered her rent, that the cover needed replacing.

Each summer, Maggie placed a plastic swimming pool over the wellhole cover to "cover up the well and to keep kids and people from walking on top of it." Maggie put water in the pool for her dogs and to keep the pool from blowing away, and she testified that the pool had no holes in it and did not leak water. On cross-examination, however, Maggie testified that she "had one pool that cracked" and that she "noticed there was a leak in it." Apparently, she replaced the pool at least once due to leakage.

Maggie testified that while mowing on July 9, 1996, she removed the pool from the wellhole cover to change the water. While pulling weeds between the wellhole and the fence, her

"big toe" was "right on the edge . . . of the ply[wood] board and the concrete." Maggie "went to get up," her "right leg went back," and she "felt it giving." Maggie testified, "When I turned, at that moment . . . it gave, and then I went down the well." Maggie's right knee hit a pump in the well as she fell. Maggie told the Tighes' landlords about the accident, and Andrew made a new, temporary cover for the wellhole. The Tighes moved out of the Cedar Lawn house in November 1997. Due to her knee injury, Maggie has seen several doctors and has had at least two surgeries.

Andrew testified that before the accident, neither Rick nor Maggie had ever asked him to replace the wellhole cover. He also testified that he at no time advised the Tighes the cover might be hazardous and that he erected no barriers to prevent them from stepping on the cover. According to Andrew, the cover became wet in July 1996 not because of the straw bales that had covered it during the winter, but because Maggie's swimming pool leaked.

## PROCEDURAL HISTORY

The Tighes' operative petition, dated September 9, 1999, stated that Cedar Lawn's negligence was the proximate cause of Maggie's fall and that Cedar Lawn was negligent in "failing to properly maintain a safe and adequate covering over the well hole," "failing to inspect and repair the defective covering," "failing to warn of the defective covering," "failing to erect barriers around the well hole," and "failing to erect notices that would warn of the existence and location of the well hole."

At the close of the Tighes' case, Cedar Lawn moved for a directed verdict, which motion the trial court sustained.

## ASSIGNMENT OF ERROR

The Tighes claim that the trial court erred in sustaining Cedar Lawn's motion for a directed verdict.

## STANDARD OF REVIEW

■ In reviewing the action of a trial court, an appellate court must treat a motion for a directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. *Koch v. Norris Pub. Power*

*Dist.*, 10 Neb. App. 453, 632 N.W.2d 391 (2001). A directed verdict is proper at the close of all the evidence only where reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law. *Id.* If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Burgess v. Miller*, 9 Neb. App. 854, 621 N.W.2d 828 (2001).

## ANALYSIS
### Uniform Residential Landlord and Tenant Act.

At the close of all the evidence, the court sustained Cedar Lawn's motion for directed verdict on the ground that the Tighes knew about the wellhole cover's defective condition, such knowledge releasing Cedar Lawn from any duty to warn. In addition, the court held that the original lease placed no duty on Cedar Lawn to maintain the wellhole cover, and the Tighes did not plead a "modification" of the original lease agreement. Therefore, the court found that there was "no course of conduct from the evidence that would create a new contractual obligation." Ultimately, the district court refused to allow an amendment to the pleadings based on a theory of recovery under the Uniform Residential Landlord and Tenant Act (URLTA) and refused to consider modification of the original lease agreement through conduct. The court considered only the original lease and negligence law in determining that Cedar Lawn owed the Tighes no duty with respect to the wellhole cover.

The Tighes rely primarily on URLTA in arguing to this court that Cedar Lawn owed them a duty. The Tighes did not plead URLTA as a theory of recovery. They argue, however, that under URLTA, Neb. Rev. Stat. § 76-1419(1) (Reissue 1996) creates a statutory duty which applies to Cedar Lawn as a matter of law even if such duty was not specifically pled. Section 76-1419(1) states that the landlord shall "[m]ake all repairs and do whatever is necessary, after written or actual notice, to put and keep the premises in a fit and habitable condition" and shall "[m]aintain in good and safe working order" all plumbing facilities. In addition, the Tighes argue that Neb. Rev. Stat. § 76-1425(2) (Reissue 1996) "gives [the Tighes] a cause of action for damages for any

noncompliance" with § 76-1419 or for any noncompliance with the lease agreement. Brief for appellant at 10. The Tighes claim that this remedy is available to them because they "did allege that [Cedar Lawn] was negligent . . . by failing to properly maintain an adequate covering over the well hole cover." *Id.*

■ Interpretation of a statute presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Hamik*, 262 Neb. 761, 635 N.W.2d 123 (2001). While URLTA does provide a cause of action for damages in the event of a breach of duty defined by § 76-1419, a review of the entire act shows that it is designed to ensure that the premises are habitable, not to create a tort action for damages which did not previously exist.

■ The text of URLTA speaks for itself. According to § 76-1402 (Reissue 1996), the underlying policy and purpose of URLTA, in addition to making uniform, clarifying, simplifying, and modernizing the law, is to "encourage landlord and tenant to maintain and improve the quality of housing." Neb. Rev. Stat. § 76-1407 (Reissue 1996) states that URLTA "appl[ies] to, regulate[s], and determine[s] *rights, obligations and remedies under a rental agreement*, wherever made, for a dwelling unit located within this state." (Emphasis supplied.) Even in § 76-1419, the section entitled "Landlord to maintain fit premises," upon which the Tighes rely so heavily, URLTA focuses on the landlord's duty to maintain habitability, not on any tort duty. Under that section, the landlord is required, among other things, to keep the premises in a "fit and habitable" condition; keep all *common areas* of the premises in a clean and safe condition; maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities and appliances; and supply running water and reasonable amounts of hot water at all times and reasonable heat. Neb. Rev. Stat. § 76-1427 (Reissue 1996) provides a remedy if "the landlord deliberately or negligently fails to supply running water, hot water, or heat, or essential services." URLTA also deals with other practical matters such as rent payments, evictions, landlord access and entry, and possession.

The point we make here is that URLTA does not provide the legal basis for the Tighes' argument. Although URLTA incorporates the common-law rule that the landlord must keep common areas safe, URLTA really is designed to assist tenants whose landlords fail to provide the basic necessities which make a dwelling unit habitable.

The legislative history of 1974 Neb. Laws, L.B. 293, sheds light on the policies underlying URLTA as well. At a public hearing on L.B. 293, a number of landlords expressed concern that a violation of § 76-1419, by creating evidence of negligence, would ultimately result in strict liability for landlords. Some landlords believed that this would raise their insurance rates and opposed the bill on that ground. Thereafter, the bill was adopted with amendments, and § 76-1419 in its final form contained the following language not present in the version of URLTA promulgated by the National Conference of Commissioners on Uniform State Laws: "The obligations imposed by this section are not intended to change existing tort law in the state."

■ Finally, Neb. Rev. Stat. § 76-1403 (Reissue 1996) states that "[u]nless displaced by [the provisions of URLTA], the principles of law and equity . . . supplement [URLTA's] provisions." And, as mentioned above, § 76-1419(1)(f) unambiguously states in part: "The obligations imposed by this section are not intended to change existing tort law in the state." See, also, *Mason v. Schumacher*, 231 Neb. 929, 439 N.W.2d 61 (1989) (URLTA does not exclude or otherwise alter common law unless expressly by URLTA provisions).

■ In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Rodriguez v. Monfort, Inc.*, 262 Neb. 800, 635 N.W.2d 439 (2001). The Tighes point to neither any language in URLTA nor any case law providing that the duties in § 76-1419 change, displace, or expand the common law. In fact, § 76-1419(1)(f) provides exactly the opposite: that existing tort law is not affected by § 76-1419. Thus, the Tighes' attempt to overturn the directed verdict by arguing that URLTA forms the substantive law governing this case, whether pled or not, lacks merit.

"An issue not presented to or passed on by the trial court is not appropriate for consideration on appeal." *Ashland State Bank v. Elkhorn Racquetball, Inc.*, 246 Neb. 411, 419, 520 N.W.2d 189, 194 (1994). "This court is obligated to dispose of cases on the basis of the theory presented by the pleadings on which the case was tried." *Id.* Thus, in discussing the directed verdict, we will consider the only cause of action pled—negligence—and consider URLTA no further.

*Common-Law Negligence.*

For the plaintiff to prevail in a negligence action, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately caused by a failure to discharge that duty. *Desel v. City of Wood River*, 259 Neb. 1040, 614 N.W.2d 313 (2000). Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person, and it necessarily requires some degree of knowledge. 57A Am. Jur. 2d *Negligence* § 89 (1989).

■ Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Claypool v. Hibberd*, 261 Neb. 818, 626 N.W.2d 539 (2001). When an appeal presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below. *Hunt v. Trackwell*, 262 Neb. 688, 635 N.W.2d 106 (2001).

Because our analysis of "duty" necessarily involves determinations of underlying fact, especially as it concerns "control" of the premises, we note that " '[t]he fact that a question of law involves the consideration of factual issues does not turn the former into a "question of fact" or necessarily mire the court in evidentiary issues of weight and credibility.' " *Knoll v. Board of Regents*, 258 Neb. 1, 6, 601 N.W.2d 757, 763 (1999), quoting *Clemets v. Heston*, 20 Ohio App. 3d 132, 485 N.E.2d 287 (1985) (stating that duty is question of law for court).

*Heins v. Webster County*, 250 Neb. 750, 552 N.W.2d 51 (1996), abrogated the distinction between invitees and licensees and held that owners and occupiers of land owe a general duty

of reasonable care to all lawful entrants. The *Heins* ruling was prospective, however, applying only to actions arising after the August 23, 1996, ruling, whereas Maggie's accident occurred on July 9, 1996. We do not consider how *Heins* might affect this case. Nonetheless, because Maggie's accident occurred before *Heins*, precedent which *Heins* abrogated or disapproved still has viability in deciding this case.

■ In the absence of an express agreement to the contrary, a lessor does not warrant the fitness or safety of the premises and the lessee takes them as he or she finds them. See *Roan v. Bruckner*, 180 Neb. 399, 143 N.W.2d 108 (1966). And, absent a contract to the contrary, the lessor is not bound to make any repairs. The contract defines the extent of the lessor's duty. *Gehrke v. General Theatre Corp.*, 207 Neb. 301, 298 N.W.2d 773 (1980); *Reicheneker v. Seward*, 203 Neb. 68, 277 N.W.2d 539 (1979).

It is undisputed that the original lease agreement places no duty upon Cedar Lawn to maintain the wellhole cover, and as the district court noted, the Tighes "pled only the [original lease] and [have] expressly pled that contract, and to allow the injection of a whole new contract at this stage [the end of the trial] would be entirely impermissible." Amendments to the pleadings should not be allowed at certain stages of trial where amendments change the issues or quantum of proof on an issue. *Postma v. B & R Stores*, 250 Neb. 466, 550 N.W.2d 34 (1996). Whether to allow such an amendment is left to the discretion of the trial court. *Id.* Given the obvious change in the nature of the case by the Tighes' attempted last-minute amendment, we cannot say the trial judge abused his discretion by refusing to allow it. Therefore, we do not consider the Tighes' suggestion that the parties' conduct modified the original lease agreement, creating a duty for Cedar Lawn to repair the wellhole cover.

Although the Tighes did not so plead, they argue further that the wellhole was a common area and that under the exception to the rule that a landlord is not bound to keep lease premises in repair unless he contracts to do so, Cedar Lawn had a duty to maintain the wellhole area. See *Smith v. Rizzuto*, 133 Neb. 655, 276 N.W. 406 (1937) (lessor is bound to exercise reasonable care in keeping premises used in connection with but not demised to

lessee reasonably safe for those having lawful occasion to use them for purpose for which they were intended).

A landlord does have a duty to keep the common areas of leased premises, such as areas under his or her control and areas used by more than one tenant, reasonably safe. See, *Johannes v. McNeil Real Estate Fund VIII*, 225 Neb. 283, 404 N.W.2d 424 (1987); *Weiss v. Autumn Hills Inv. Co.*, 223 Neb. 885, 395 N.W.2d 481 (1986). To hold an owner of leased premises liable for injuries suffered as a result of the condition of the leased premises, it must appear that the landlord had a right to present possession or present control or dominion thereover. See, *Weiss, supra*; *Hiatt v. Tallmage*, 219 Neb. 635, 365 N.W.2d 448 (1985) (landlord not liable to tenant who slipped on dog excrement on stairway intended for tenant's exclusive use and under tenant's control).

We cannot say, despite testimony that Andrew maintained the wellhole, its contents, and its cover, that the wellhole was a common area. Clearly, the area was not reserved for the use of multiple tenants, as the Tighes were the only tenants of the property in question. Where liability is sought to be imposed upon a landlord for injury which occurred in areas used by more than one tenant, liability is based on the fact that such area was not demised to any one tenant and was therefore retained under the control of the landlord. Annot., 65 A.L.R.3d 14 (1975). Courts typically hold that retention of control is not established where there is no clear proof that more than one tenant had the right to use such premises. *Id.*

In addition, as Cedar Lawn notes in its brief, Nebraska case law distinguishes between areas which are demised entirely to the tenants and those of which the landlord retains possession: a lessor is bound to exercise reasonable care in keeping premises used in connection with *but not demised to the lessee* reasonably safe for those having lawful occasion to use them for the purpose for which they were intended. *Esbenshade v. National Life Ins. Co.*, 208 Neb. 216, 303 N.W.2d 272 (1981); *Smith v. Rizzuto, supra*. The Tighes do not dispute that the entire lawn area, including the wellhole area, was demised to them, and the lease specifically lists the lawn as part of the property which the Tighes rented and were responsible for maintaining.

Further, although Andrew testified that he typically inspected and performed routine maintenance on the wellhole cover every 2 years or so, in the light of other factors which determine control or lack thereof, that evidence alone does not establish that Cedar Lawn retained sufficient control over the wellhole to make it a common area. Indeed, the Tighes testified that from the time they leased the premises in 1986, they never saw anyone change the wellhole cover and never heard that the wellhole cover had been replaced, and that they believed the same cover had been there from 1986 until the time of the accident. The implication from this evidence, that Andrew never changed the cover, negates the Tighes' own theory that Andrew was in control of that area. In addition, the Tighes testified that for the majority of their lease term, they were responsible for placing and removing the straw bales which covered the wellhole during the winter. Finally, the Tighes were responsible for maintaining the lawn surrounding the wellhole.

In reviewing the action of a trial court, an appellate court must treat a motion for a directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. *Koch v. Norris Pub. Power Dist.*, 10 Neb. App. 453, 632 N.W.2d 391 (2001). Thus, despite any testimony to the contrary, we must and do accept the Tighes' assertions as true. Their testimony establishes that they exercised some control over the wellhole area, that they alone were demised the wellhole area, and that the control actually asserted by Cedar Lawn, as opposed to any control that Cedar Lawn retained in theory, was so negligible that the Tighes cannot now force this case to fit into the common area doctrine—putting aside their failure to plead such facts and theory.

## CONCLUSION

The district court was correct in finding as a matter of law that Cedar Lawn owed no duty to the Tighes. Cedar Lawn neither contracted to repair the wellhole nor retained sufficient control of the wellhole area to create a duty of repair under the common area exception. Because the Tighes did not plead modification of the original lease, the district court did not err in declining to consider whether the parties' course of conduct

would alter the lease. Finally, we are wholly unpersuaded by the Tighes' argument that URLTA requires Cedar Lawn to maintain the wellhole cover. As discussed previously, the Tighes failed to plead URLTA, which in any event does not alter existing tort law, and the plain language of the lease agreement requires the Tighes to "maintain and keep said property in a good state of repair" while imposing no such duty on Cedar Lawn. We therefore affirm the district court's finding that the Tighes did not establish Cedar Lawn's duty, and we hold that the court was correct in directing a verdict in Cedar Lawn's favor.

AFFIRMED.