771 N.W.2d 103 (2009)
278 Neb. 428
Leon Dean KUHN, Personal Representative of the Estate of Ashton Hasebrook, appellee,
v.
WELLS FARGO BANK OF NEBRASKA, N.A., appellee,
TJ Lauvetz Enterprises, Inc., defendant and third-party plaintiff, appellant, and
O'Keefe Elevator Company, Inc., third-party defendant, appellee.
No. S-08-141.
Supreme Court of Nebraska.
August 28, 2009.
*109 Justin R. Herrmann and Jeffrey H. Jacobsen, of Jacobsen, Orr, Nelson, Lindstrom & Holbrook, P.C., L.L.O., Kearney, for appellant.
Michael F. Scahill and Terry J. Grennan, of Cassem, Tierney, Adams, Gotch & Douglas, Omaha, for appellee Wells Fargo Bank of Nebraska, N.A.
HEAVICAN, C.J., WRIGHT, GERRARD, STEPHAN, and MILLER-LERMAN, JJ.
GERRARD, J.
This appeal arises from a procedurally complicated tort case involving an injured plaintiff, the owner of the building in which the plaintiff was injured, the bank that the plaintiff was in the building to patronize, and the installer of the elevator in which the plaintiff fell. The bank was dismissed from the case, and the remaining parties apparently settled, although the settlement agreement is not in the record. The question presented, on further review to this court, is whether the building owner's appeal from the dismissal of its indemnity claim against the bank is moot because the appellate record does not contain the terms of the building owner's settlement with the plaintiff. We conclude that the appeal is not moot. We further conclude that the district court erred in dismissing the bank from the case.

I. BACKGROUND

1. PREMISES AND LEASE
TJ Lauvetz Enterprises, Inc. (Lauvetz), owned Burlington Center, a building in Hastings, Nebraska, containing approximately 55,000 rentable square feet. Lauvetz leased a little less than half that space to what is now Wells Fargo Bank of Nebraska, N.A. (the Bank), on the first floor and on the "garden," or basement, level of the building. The rest of the building contained other offices, including Lauvetz'.
Lauvetz' lease agreement with the Bank provided, within the "Utilities and Services" section, that Lauvetz "shall furnish passenger elevator service whenever the Building is open." Lauvetz "shall have the right to stop the operation of said elevators whenever alterations, improvements or repairs therein or in the machinery or appliances connected therewith shall be necessary or desirable and shall not be liable for damages for any such stoppage of service." And the "indemnity" section, paragraph 20 of the lease, provided, in relevant part:
With the exception of those claims arising out of [Lauvetz'] gross negligence or willful misconduct, ... [the Bank] shall indemnify [Lauvetz] and hold it harmless from any claim or damage arising out of any injury, death or property damage occurring in, on or about the Property, the Building, the Leased Premises and appurtenances thereto to [the Bank] or an employee, customer or invitee of [the Bank]. With the exception of those claims arising out of [the Bank's] negligence or willful misconduct,... [Lauvetz] shall indemnify [the Bank] and hold it harmless from any claim or damage arising out of any injury, death or property damage occurring in, on or about the Property, the Building, the *110 Leased Premises and appurtenances thereto to [Lauvetz] or any employee, customer or invitee of [Lauvetz].
(Emphasis supplied.)

2. ACCIDENT
The elevators in the building had been malfunctioning by reporting to the wrong floors. A repairperson from O'Keefe Elevator Company (O'Keefe) instructed Lauvetz to implement a new procedure for elevator use over the weekend. The old procedure had been to take the elevators to the ground floor and turn them off. To help O'Keefe diagnose the problem, the repairperson suggested that the malfunctioning elevator be turned to "independent service" over the weekend of March 1, 2003. An elevator on independent service does not respond to calls from hallway buttons. Instead, the elevator remains parked with the doors open until a floor is selected on the inside panel and the "close door" button is held down. The elevator will then travel to the selected floor, where it will again remain parked with the doors open.
In addition to helping O'Keefe diagnose the problem, setting the elevator to independent service would allow the building's janitors to use it over the weekend. That was why it was decided not to put a sign or caution tape in front of the elevator. But turning an elevator to independent service can also cause the elevator's self-leveling device to not operate properly.
The new independent service procedure began on a Friday. Early the next day, Ashton Hasebrook, who was 90 years old, visited the Bank to get a certificate of deposit from his safe deposit box, which was located in the Bank's basement. He went to the elevators to go back upstairs and found one standing open. He stepped into the elevator, fell, and broke his hip. Hasebrook testified that the elevator car was "about a foot" below floor level, although other observers described the difference as being less than 2 inches after the accident.

3. PROCEDURAL HISTORY
Hasebrook sued Lauvetz and the Bank in district court, seeking damages for medical expenses, pain and suffering, disability, and future medical care. Lauvetz and the Bank filed cross-claims against one another, seeking indemnity under paragraph 20 of the lease. And Lauvetz filed a third-party complaint against O'Keefe. Hasebrook later died, and the claim was revived by Leon Dean Kuhn, the personal representative of his estate. For the sake of clarity, the estate is also referred to simply as "Hasebrook."
In 2006, the Bank and Lauvetz each filed motions for summary judgment. The district court found that the Bank could not be liable to Hasebrook because it did not control the elevator. The court reasoned that the lease agreement did not shift the duty Lauvetz owed to Hasebrook from Lauvetz to the Bank. The court further found that paragraph 20 of the lease was "ambiguous and does not clearly set forth that Lauvetz should be indemnified by [the Bank]." Therefore, the court found that Lauvetz' cross-claim against the Bank did not state a claim upon which relief could be granted. The court denied Lauvetz' motion for summary judgment and granted the Bank's. The Bank was dismissed as a party, with prejudice. Lauvetz filed a notice of appeal, but the appeal was dismissed without opinion for lack of a final, appealable order.[1]
The claims left pending were Hasebrook's against Lauvetz, and Lauvetz' against O'Keefe. In 2008, Hasebrook, *111 Lauvetz, and O'Keefe filed a joint motion and stipulation for dismissal with prejudice. Apparently, the various claims were settled, although the settlement itself is not in the record. The district court granted the motion and dismissed the remaining claims. Lauvetz again filed an appeal from the 2006 summary judgment order, contending that the court had erred in granting summary judgment for the Bank and dismissing it from the case.
The Nebraska Court of Appeals dismissed the appeal as moot.[2] The Court of Appeals explained that the final order entered in 2008 dismissed Hasebrook's complaint without any finding as to liability or an award of damages. Although the order theoretically preserved Lauvetz' cross-claim against the Bank, the Court of Appeals reasoned that without a finding of liability or damages against Lauvetz, there was no basis for indemnity. Although Lauvetz asserted at oral argument that the case had been settled, the Court of Appeals found that to be irrelevant, because there was no evidence in the record of any settlement agreement or payment pursuant to such an agreement. The court concluded that because of the 2008 order dismissing Hasebrook's claim against Lauvetz, any opinion on Lauvetz' right to indemnity from the Bank would be moot.[3] We granted Lauvetz' petition for further review.

II. ASSIGNMENTS OF ERROR
On further review, Lauvetz assigns that the Court of Appeals erred in determining that the district court's 2008 order dismissing Hasebrook's complaint as to Lauvetz rendered Lauvetz' appeal of its cross-claim against the Bank moot.
In its brief to the Court of Appeals, Lauvetz assigned, consolidated and restated, that the district court erred in (1) finding that Lauvetz could not contractually require indemnification from the Bank for damages arising from an injury occurring to the Bank's customer on the leased premises and arising from Lauvetz' ordinary negligence, (2) finding that the indemnification provision of the lease was ambiguous and did not clearly set forth that Lauvetz should be indemnified by the Bank, (3) failing to apply the indemnification provision as written, and (4) overruling Lauvetz' motion for summary judgment and sustaining the Bank's.
Lauvetz also assigned error with respect to the court's finding that Lauvetz, not the Bank, had a legal duty to Hasebrook to maintain a safe elevator. But Lauvetz did not argue that in his brief, so it does not need to be addressed.[4]

III. STANDARD OF REVIEW
Because mootness is a justiciability doctrine that operates to prevent courts from exercising jurisdiction, an appellate court reviews mootness determinations under the same standard of review as other jurisdictional questions.[5] When a jurisdictional question does not involve a factual dispute, its determination is a matter of law, which requires an appellate court to reach a conclusion independent of the decisions made by the lower courts.[6]
*112 In reviewing summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, giving that party the benefit of all reasonable inferences deducible from the evidence.[7]
The meaning of a contract and whether a contract is ambiguous are questions of law.[8] The meaning of a statute is also a question of law.[9] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[10]

IV. ANALYSIS

1. MOOTNESS
Lauvetz assigns that the Court of Appeals erred in dismissing its appeal as moot. A case becomes moot when the issues initially presented in the litigation cease to exist, when the litigants lack a legally cognizable interest in the outcome of litigation, or when the litigants seek to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive.[11] Although not a constitutional prerequisite for jurisdiction, an actual case or controversy is necessary for the exercise of judicial power.[12] In the absence of an actual case or controversy requiring judicial resolution, it is not the function of the courts to render a judgment that is merely advisory.[13] Therefore, as a general rule, a moot case is subject to summary dismissal.[14]
Lauvetz does not take issue with these propositions. Nor does Lauvetz argue that any exception to the mootness doctrine is applicable.[15] And Lauvetz does not contend that in the absence of some liability to Hasebrook, there is any basis for indemnity. Under Nebraska law, indemnification is available when one party is compelled to pay money which in justice another ought to pay or has agreed to pay.[16] Lauvetz' claim for indemnification will ultimately require proof of such a payment to Hasebrook, in essence to prove its damages.
Instead, the issue here is based on the appellate record. As the Court of Appeals noted, the record does not affirmatively demonstrate that this appeal is not moot that is, the record does not prove a basis for Lauvetz' liability besides the now-dismissed tort action. But the record does not disprove other bases for liability eitherin particular, the apparent settlement of Hasebrook's tort claim. We must determine what inferences can be drawn from such a record or, more precisely, what the record should show in order for an appellate court to make a determination regarding mootness.
*113 In that regard, our decisions in Mullendore v. School Dist. No. 1 (Mullendore I)[17] and Mullendore v. Nuernberger (Mullendore II)[18] are instructive. In those cases, the Legislature had enacted a law containing a formula for determining non-resident high school tuition and a corresponding tax levy.[19] A taxpayer filed a petition for declaratory judgment in the district court, challenging the law as unconstitutional. But before the case was decided by the district court, the Legislature repealed the law. The district court granted the defendants' motion for summary judgment, reasoning that the repeal of the challenged legislation made the case moot.
But in Mullendore I, we reversed that determination. We noted that the record did not conclusively establish that taxes had already been collected under the challenged law. However, the taxpayer's petition "provide[d] a reasonable inference" that they had.[20] If taxes had been levied, a controversy would remain between the taxpayers and school district. And while the record did not establish that taxes had been collected, it did not establish that they had not been either. Therefore, there was a question of fact regarding the viability of the action, and the district court had erred in dismissing it as moot.[21]
On remand, the district court decided the case on the constitutional merits, and it declared the law unconstitutional. But on appeal, we again reversed the district court's judgment, finding in Mullendore II that there was no justiciable case or controversy.[22] In Mullendore II, unlike Mullendore I, the court had decided the declaratory judgment action on the merits. And the taxpayer had still not proved any adverse impact on him while the challenged legislation had been in effect. So, we reasoned that the taxpayer had failed to prove an element of his prima facie case for declaratory relief, because he had not proved that his rights had been affected by the statute.[23]
The difference between Mullendore I and Mullendore II was the burden of proof. In Mullendore I, the burden had been on the defendants to establish that the case was moot, so when the record did not affirmatively prove mootness, we reversed the lower court's dismissal. But the taxpayer still had the burden to prove his prima facie case for declaratory relief in order to prevail on the merits, and in Mullendore II, we determined he had not.
The procedural posture of the present case is more akin to Mullendore I. Generally, the burden of proving mootness is on the party seeking dismissal.[24] Although the Court of Appeals raised mootness as an issue in this case sua sponte, the principle remains the same. In the district court, the Bank's motion for summary judgment did not shift the burden *114 to Lauvetz to prove damages, because the motion was based solely on the lease. In the Court of Appeals, no order to show cause was entered that directed either party to adduce evidence relating to mootness. Without a motion or order requiring Lauvetz to present evidence of damages, there was no basis for the Court of Appeals to infer mootness from the absence of such evidence.
In order to prevail on the merits of its claim, Lauvetz will have to prove that it was liable to Hasebrook. One possible means of establishing this liabilitya court judgment on the merits of Hasebrook's tort claimhas been foreclosed. But the record does not foreclose the possibility that Lauvetz paid Hasebrook in settlement of his claim. That, in fact, may reasonably be inferred from this record. Hasebrook's dismissal of his tort claim precludes one way of proving liability, but does not support a finding of mootness.
A brief hypothetical might help to illustrate this point. A plaintiff sues a defendant in a separate actionnot a crossclaimfor contractual indemnification. The defendant files a motion for summary judgment based solely on the allegation that the contract provides no basis for indemnity. The motion is sustained, and the plaintiff appeals. An appellate court would not be justified in dismissing the appeal as "moot" simply because the record did not prove that the plaintiff had suffered damages. At that point in the action, the plaintiff would not have been required to present evidence of damages, and there would be no burden on the plaintiff to present a record affirmatively proving its damages or any other element of its prima facie case besides the contract.
The procedural posture of the present case is substantially indistinguishable. The record does not show that Lauvetz will be able to prove liability to Hasebrook, but does not foreclose it either. The order of dismissal does not mean that Lauvetz cannot prove liability arising from some other source (e.g., settlement payment), and the Court of Appeals should not have assumed an absence of liability from an absence of evidence, when Lauvetz' burden to prove liability had not yet been implicated. The record does not show that Lauvetz' appeal is moot, and Lauvetz' assignment of error on further review has merit.
The Court of Appeals erred in finding that this appeal is moot, and its decision to that effect will be reversed. Upon reversing a decision of the Court of Appeals, we may consider, as it deems appropriate, some or all of the assignments of error the Court of Appeals did not reach.[25] Because some of the issues raised in the Court of Appeals involve novel legal questions,[26] we will consider the errors Lauvetz assigned in its appellate brief.

2. INDEMNITY CLAUSE
Lauvetz argues, generally, that the district court erred in finding that paragraph 20 of the lease is ambiguous and does not clearly set forth that Lauvetz should be indemnified by the Bank. The Bank makes three arguments in response: (1) that paragraph 20 is ambiguous and unenforceable, (2) that paragraph 20 is void as against public policy under Neb.Rev.Stat. § 25-21,187 (Reissue 2008), and (3) that there is no basis for indemnity because the Bank and Lauvetz share no common liability *115 to Hasebrook. We address each argument in turn.

(a) Ambiguity
By way of reminder, the "indemnity" language of paragraph 20 most pertinent to this case provides:
With the exception of those claims arising out of [Lauvetz'] gross negligence or willful misconduct, ... [the Bank] shall indemnify [Lauvetz] and hold it harmless from any claim or damage arising out of any injury, death or property damage occurring in, on or about the Property, the Building, the Leased Premises and appurtenances thereto to [the Bank] or an employee, customer or invitee of [the Bank].
(Emphasis supplied.) The district court found this language to be ambiguous, and the Bank argues that the district court was right.

(i) Inclusion of Indemnitee's Negligence
The Bank relies on the proposition that an indemnitee may be indemnified against his or her own negligence if the contract contains express language to that effect or contains clear and unequivocal language that that is the intention of the parties.[27] The parties to the contract are presumed to intend that the indemnitee shall not be indemnified for a loss occasioned by his or her own negligence unless the language of the contract affirmatively expresses an intent to indemnify for such loss.[28] The Bank argues that the language at issue in this case does not clearly set forth that Lauvetz should be indemnified for its own negligence.
But the language at issue quite clearly requires the Bank to indemnify Lauvetz for something. And it is difficult to read the specific exclusion of "gross negligence" from indemnification as anything other than the inclusion of ordinary negligence.[29] An indemnity agreement is a contract to be construed according to the principles generally applied in construction or interpretation of other contracts.[30] And a contract must receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract.[31] The specific exclusion of the Bank's ordinary negligence from Lauvetz' duty to indemnify it demonstrates that the parties were aware of the distinction and chose not to exclude ordinary negligence from the Bank's duty to indemnify Lauvetz.
Paragraph 20 plainly requires the Bank to indemnify Lauvetz for any claim or damage arising out of any injury occurring in the building to a customer of the Bank, except for claims arising from Lauvetz' "gross negligence or willful misconduct." Gross negligence is great or excessive negligence, which indicates the absence of even slight care in the performance of a duty.[32] If "any injury" within the meaning of paragraph 20 did not include the indemnitee's negligence, it would have been unnecessary to specifically exclude the Bank's negligence and Lauvetz' gross negligence. Because paragraph 20 *116 places a duty on the Bank to indemnify Lauvetz for any injury other than gross negligence, it clearly still includes negligence that is less than gross,[33] just as Lauvetz' duty to indemnify the Bank does not.

(ii) Meaning of "Invitee"
The Bank also argues that paragraph 20 is ambiguous because it is circular. The Bank argues that a customer of the Bank is also, logically, an invitee of Lauvetz.[34] Therefore, the Bank contends that a customer of the Bank is an invitee of both the Bank and Lauvetz, and the parties would be required to indemnify one another. The Bank argues that because this is an illogical result, paragraph 20 must be unenforceable. We disagree. As noted above, a contract must be given a reasonable construction, which, if possible, gives effect to every part of the contract.[35] The Bank's construction of paragraph 20 is contrary to that well-established proposition.
To begin with, even if paragraph 20 was ambiguous about whose injuries were to be indemnified, it would still be clear about the duty to indemnify, and the inclusion of Lauvetz' negligence within that duty. In other words, paragraph 20 would still be unambiguous on the points that are necessary in order for it to be enforceable. But more fundamentally, we disagree with the premise of the Bank's argument, that paragraph 20 is circular.
An "invitee," in the common sense of the word, is simply "one who is invited."[36] More particularly, in tort law, an invitee is a person who goes on the premises of another in answer to the express or implied invitation of the owner or occupant on the business of the owner or occupant or for their mutual advantage.[37] (We note that the lease in this case was executed before the tort-law distinction between invitees and licensees was abolished in Nebraska.[38]) A landlord has a duty to keep the common areas of leased premises, such as areas under his or her control and areas used by more than one tenant, reasonably safe.[39] And guests and invitees of the tenant derive their right to enter upon the premises leased through the tenant and have the same but no greater right to proceed against the landlord for personal injuries resulting from alleged defects than the tenant has.[40]
In this case, there is no dispute that Hasebrook was primarily a customer and invitee of the Bank. Any status he might have had as an invitee of Lauvetz was derived through the Bank.[41] And this is not a tort actionthe question is not the scope of Hasebrook's right to sue, but the meaning of paragraph 20 of the lease. Even if an invitee of the Bank has derivative *117 status as an invitee of Lauvetz for purposes of premises liability, it is entirely possibleand reasonableto distinguish primary invitees of the Bank from primary invitees of Lauvetz when construing paragraph 20. The obvious intent of paragraph 20 is to require each party to be responsible for injuries to its own visitors. Except for the rare instance in which the same visitor has business with both Lauvetz and the Bank, it should not be difficult to determineas in this case who an injured person was in the building to see. Under such circumstances, paragraph 20 is not difficult to apply.
Simply put, paragraph 20 is part of a lease agreement that was negotiated at arm's length between sophisticated business entities.[42] The Bank was certainly capable of examining the lease and recognizing paragraph 20 as an indemnity clause. The lease, in fact, connotes the unmistakable intent of the parties to indemnify,[43] excepting only claims arising from the Bank's ordinary negligence, Lauvetz' gross negligence, or the willful misconduct of either. We find no merit to the Bank's argument that paragraph 20 is ambiguous. And accordingly, we find merit to Lauvetz' argument that the district court erred in that regard.

(b) § 25-21,187(1)
As an alternative, the Bank relies on § 25-21,187(1), which provides in relevant part:
In the event that a public or private contract or agreement for the construction, alteration, repair, or maintenance of a building, structure, highway bridge, viaduct, water, sewer, or gas distribution system, or other work dealing with construction or for any moving, demolition, or excavation connected with such construction contains a covenant, promise, agreement, or combination thereof to indemnify or hold harmless another person from such person's own negligence, then such covenant, promise, agreement, or combination thereof shall be void as against public policy and wholly unenforceable.
The Bank argues that the lease, which discusses the parties' respective obligations to maintain the premises, is a contract for the "maintenance of a building" within the meaning of § 25-21,187(1). Thus, the Bank argues that paragraph 20 is void to the extent that it purports to require the Bank to indemnify Lauvetz for Lauvetz' own negligence.
Statutes like § 25-21,187(1) are not uncommon, but are generally applied to construction contracts. The purpose of such statutes is to prohibit avoidance by parties to construction contracts of all risks created by their own fault associated with contract performance, to require employers to provide employees with a safe place to work, and to preclude delegating to subcontractors such duty.[44] Authority is sparse regarding the application of such provisions to leases of real property. Some courts have, without much discussion, applied comparable statutes to real property leases.[45]
More fully reasoned opinions, however, have held comparable statutory language *118 to be inapplicable to circumstances beyond the construction or building activity to which the statute was intended to apply.[46] At common law, a party could protect itself from the consequences of its own negligence by contract, and because the statutory language changes the common law with respect to construction contracts, it should be strictly construed.[47] And by specifically addressing indemnity clauses in the construction industry, the Legislature showed an intention that the practice not be barred in other industries, such as the leasing of commercial property.[48]
Thus, courts have concluded that the statutory language was simply not intended to protect parties to transactions outside the construction industry.[49] In particular, courts have rejected the arguments that general janitorial services[50] and elevator repair[51] are "maintenance" within the meaning of comparable statutory language, because the statute was intended to apply to construction services. In short, given the statute's purpose, it has been held that its scope should not be extended beyond its intended limits to activity with only a tenuous connection with any construction activity.[52]
That reasoning is persuasive, and consistent with both the history and intent of § 25-21,187(1) and our basic principles of statutory construction. The principal objective of construing a statute is to determine and give effect to the legislative intent of the enactment.[53] And a court may examine the legislative history of the act in question in order to ascertain the intent of the Legislature.[54] The legislative history of § 25-21,187(1) clearly establishes that its intent was to "prohibit the use by architects and engineers of hold harmless clauses in construction contracts."[55] The statute is simply meant to provide that on construction projects, parties such as contractors and architects remain responsible for their own negligence.[56]
And under the ejusdem generis canon of construction, when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed.[57] In other words, specific terms modify and restrict the interpretation of general terms when they are used *119 in a sequence.[58] Here, ejusdem generis principles suggest that the word "maintenance" in § 25-21,187(1) is intended to encompass activity of the same general type as, though not specifically embraced within, "construction, alteration, [or] repair."[59] Section § 25-21,187(1) is also in derogation of the common law, and as such, should be strictly construed.[60]
Based on those principles, and well-reasoned authority from other jurisdictions, we hold that "maintenance of a building," within the meaning of § 25-21,187(1), does not encompass the ordinary activities associated with management of commercial property. To hold otherwise would be to expand the scope of § 25-21,187(1) to void indemnity clauses in contracts well beyond the Legislature's intent. We find no merit to the Bank's argument that paragraph 20 of the lease is contrary to § 25-21,187(1).

(c) Common Liability
Finally, the Bank argues that it cannot be liable to indemnify Lauvetz, because Lauvetz and the Bank do not share a common liability to Hasebrook. But the Bank's argument does not account for the differences between indemnity and contribution and among different types of indemnity. And the Bank's argument is incorrect because in this case, the basis of Lauvetz' claim to indemnity is contractual.
First, it is important to distinguish between principles of contribution and indemnification. Contribution is defined as a sharing of the cost of an injury as opposed to a complete shifting of the cost from one to another, which is indemnification.[61] Common liability is required between a party seeking contribution and the party from whom it is sought.[62] Contrary to the Bank's suggestion, principles of indemnification and contribution are not interchangeable. Indemnification is distinguishable from the closely related remedy of contribution in that the latter involves a sharing of the loss between parties jointly liable.[63]
An obligation to indemnify, however, may grow out a liability imposed by law or a contractual relation.[64] Indemnity may occur when an active or primary tort-feasor is held liable for injuries proximately caused by the passive negligence of a joint tort-feasor.[65] But indemnity may also occur when a party expressly contracts for it.[66] The most common example of indemnity arising from express contract is simplean insurance contract.[67] Taken *120 at face value, the logical implication of the Bank's argument is that liability insurance policies would be unenforceable unless the insurer was independently liable to the injured party. Obviously, that cannot be the case.
Simply stated, while a common liability between an active and passive tort-feasor is one way for indemnity to arise, it is not the only way.[68] Indemnity can also be based on an express contract, as it is here. The Bank's argument that indemnity cannot occur without common liability is without merit.

3. LAUVETZ' MOTION FOR SUMMARY JUDGMENT
For the reasons explained above, we find merit to Lauvetz' argument that the district court erred in sustaining the Bank's motion for summary judgment and concluding as a matter of law that the indemnity clause in paragraph 20 was ambiguous and unenforceable. Therefore, the judgment will be reversed, and the cause remanded for further proceedings. But we do not agree with Lauvetz' suggestion that we should enter an order granting its motion for summary judgment.
We recognize that when adverse parties have each moved for summary judgment and the trial court has sustained one of the motions, the reviewing court obtains jurisdiction over both motions and may determine the controversy which is the subject of those motions.[69] But here, as discussed above, there is no evidence establishing that Lauvetz was liable to Hasebrook, or for what. And because the parties' attention has been focused on whether paragraph 20 was enforceable at all, there has been little discussion of other issuesfor instance, whether Lauvetz might have committed gross negligence, which would be excepted. Therefore, we conclude that directing the entry of summary judgment would be inappropriate. Instead, the cause will be remanded for further proceedings consistent with this opinion.

V. CONCLUSION
The Court of Appeals erred by dismissing this appeal as moot, because the burden had not yet been placed on Lauvetz to prove damages, and the record does not foreclose the possibility that Lauvetz was liable to Hasebrook. The district court erred in concluding that paragraph 20 was ambiguous, and we find no merit to the Bank's alternative reasons why paragraph 20 was purportedly unenforceable. The judgment of the Court of Appeals is reversed, and the cause remanded to the Court of Appeals with directions to reverse the judgment of the district court and remand the cause to the district court for further proceedings consistent with this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
CONNOLLY and McCORMACK, JJ., not participating.
NOTES
[1] See Kuhn v. Wells Fargo Bank, No. A-06-1003 (Neb.App. Nov. 8, 2006).
[2] See Kuhn v. Wells Fargo Bank of Neb., No. A-08-141, 2009 WL 97167 (Neb.App. Jan. 13, 2009) (selected for posting to court Web site).
[3] See id.
[4] See Epp v. Lauby, 271 Neb. 640, 715 N.W.2d 501 (2006).
[5] In re Interest of Anaya, 276 Neb. 825, 758 N.W.2d 10 (2008).
[6] Id.
[7] In re Estate of Ronan, 277 Neb. 516, 763 N.W.2d 704 (2009).
[8] Pavers, Inc. v. Board of Regents, 276 Neb. 559, 755 N.W.2d 400 (2008).
[9] Harvey v. Nebraska Life & Health Ins. Guar. Assn., 277 Neb. 757, 765 N.W.2d 206 (2009).
[10] In re Estate of Ronan, supra note 7.
[11] BryanLGH v. Nebraska Dept. of Health & Human Servs., 276 Neb. 596, 755 N.W.2d 807 (2008).
[12] Id.
[13] Id.
[14] Id.
[15] See, e.g., In re Interest of Anaya, supra note 5.
[16] See, Cerny v. Todco Barricade Co., 273 Neb. 800, 733 N.W.2d 877 (2007); Warner v. Reagan Buick, 240 Neb. 668, 483 N.W.2d 764 (1992).
[17] Mullendore v. School Dist. No. 1, 223 Neb. 28, 388 N.W.2d 93 (1986).
[18] Mullendore v. Nuernberger, 230 Neb. 921, 434 N.W.2d 511 (1989).
[19] See 1982 Neb. Laws, L.B. 933.
[20] See Mullendore I, supra note 17, 223 Neb. at 37, 388 N.W.2d at 100.
[21] See id.
[22] See Mullendore II, supra note 18.
[23] See Neb.Rev.Stat. § 25-21,150 (Reissue 2008).
[24] See, e.g., County of Los Angeles v. Davis, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); Kansas Judicial Review v. Stout, 562 F.3d 1240 (10th Cir.2009); In re Smith, 880 A.2d 269 (D.C.2005); Novi v. Adell Children's Funded Trust, 473 Mich. 242, 701 N.W.2d 144 (2005).
[25] Incontro v. Jacobs, 277 Neb. 275, 761 N.W.2d 551 (2009).
[26] See Neb.Rev.Stat. § 24-1106(2) (Reissue 2008).
[27] See Oddo v. Speedway Scaffold Co., 233 Neb. 1, 443 N.W.2d 596 (1989).
[28] See Peter Kiewit Sons Co. v. O'Keefe Elevator Co., Inc., 191 Neb. 50, 213 N.W.2d 731 (1974).
[29] Cf. Mahnke v. State, 276 Neb. 57, 751 N.W.2d 635 (2008).
[30] Oddo, supra note 27.
[31] State ex rel. Bruning v. R.J. Reynolds Tobacco Co., 275 Neb. 310, 746 N.W.2d 672 (2008).
[32] Bennett v. Labenz, 265 Neb. 750, 659 N.W.2d 339 (2003).
[33] See, e.g., Law v. Reading Company, 312 F.2d 841 (3d Cir.1963); Blue Grass Restaurant Company v. Franklin, 424 S.W.2d 594 (Ky.1968); Leonard L. Farber Company, Inc. v. Jaksch, 335 So.2d 847 (Fla.App.1976).
[34] See, e.g., Ginn v. Lamp, 234 Neb. 198, 450 N.W.2d 388 (1990); Van Avery v. Platte Valley Land & Investment Co., 133 Neb. 314, 275 N.W. 288 (1937).
[35] See R.J. Reynolds Tobacco Co., supra note 31.
[36] 8 The Oxford English Dictionary 54 (2d ed.1989).
[37] Heins v. Webster County, 250 Neb. 750, 552 N.W.2d 51 (1996).
[38] See id.
[39] See Tighe v. Cedar Lawn, Inc., 11 Neb.App. 250, 649 N.W.2d 520 (2002).
[40] See Ginn, supra note 34.
[41] See id.
[42] See Hogeland v. Sibley, Lindsay, 42 N.Y.2d 153, 366 N.E.2d 263, 397 N.Y.S.2d 602 (1977).
[43] See id.
[44] See, generally, 42 C.J.S. Indemnity § 9 (2007).
[45] See, Borg-Warner v. Executive Park Ventures, 198 Ga.App. 70, 400 S.E.2d 340 (1990); Lawlor v. MFD 1251 Americas Corp., No. 93 Civ. 1862(SWK), 1995 WL 110090, 1995 WL 110090 (S.D.N.Y. Mar. 14, 1995).
[46] See, Smith v. Seaboard Coast Line R. Co., 639 F.2d 1235 (5th Cir.1981); Kole v. Amfac, Inc., 665 F.Supp. 1460 (D.Haw.1987); Kone, Inc. v. Robinson, 937 So.2d 238 (Fla.App. 2006); McNiff v. Millard Maintenance Service Co., 303 Ill.App.3d 1074, 715 N.E.2d 247, 239 Ill.Dec. 802 (1999); Phoenix Ins. Co. v. Town of Vernon, No. HHDX07CV044025148, 2007 WL 196405 (Conn.Super.Jan.5, 2007).
[47] Smith, supra note 46.
[48] See Phoenix Ins. Co., supra note 46.
[49] See Kole, supra note 46.
[50] See McNiff, supra note 46.
[51] See Kone, Inc., supra note 46.
[52] Smith, supra note 46.
[53] See Mason v. State, 267 Neb. 44, 672 N.W.2d 28 (2003).
[54] Shipler v. General Motors Corp., 271 Neb. 194, 710 N.W.2d 807 (2006).
[55] Statement of Intent, L.B. 288, Banking, Commerce & Insurance Committee, 86th Leg., 1st Sess. (Feb. 26, 1979) (emphasis supplied).
[56] See id.
[57] State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007), cert. denied ___ U.S. ___, 128 S.Ct. 715, 169 L.Ed.2d 560; Nebraska Liq. Distrib. v. Nebraska Liq. Cont. Comm., 269 Neb. 401, 693 N.W.2d 539 (2005).
[58] See, Coral Prod. Corp. v. Central Resources, 273 Neb. 379, 730 N.W.2d 357 (2007); Nebraska Liq. Distrib., supra note 57; Jensen v. Board of Regents, 268 Neb. 512, 684 N.W.2d 537 (2004).
[59] See Columbia Nat. Ins. v. Pacesetter Homes, 248 Neb. 1, 532 N.W.2d 1 (1995).
[60] See, Smith, supra note 46; Tadros v. City of Omaha, 273 Neb. 935, 735 N.W.2d 377 (2007).
[61] Estate of Powell v. Montange, 277 Neb. 846, 765 N.W.2d 496 (2009); Cerny, supra note 16.
[62] See Estate of Powell, supra note 61.
[63] See Warner, supra note 16.
[64] See Hiway 20 Terminal, Inc. v. Tri-County Agri-Supply, Inc., 232 Neb. 763, 443 N.W.2d 872 (1989). See, also, Harsh International v. Monfort Indus., 266 Neb. 82, 662 N.W.2d 574 (2003); Motor Club Ins. Assn. v. Fillman, 5 Neb.App. 931, 568 N.W.2d 259 (1997).
[65] See, Harsh International, supra note 64; Hiway 20 Terminal, Inc., supra note 64.
[66] See, e.g., Oddo, supra note 27.
[67] See First Trust Co. v. Airedale Ranch & Cattle Co., 136 Neb. 521, 286 N.W. 766 (1939).
[68] See, e.g., Hysell v. Iowa Public Service Co., 534 F.2d 775 (8th Cir. 1976).
[69] See Jones v. Shelter Mut. Ins. Cos., 274 Neb. 186, 738 N.W.2d 840 (2007).