Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/29/2022 09:07 AM CDT

Trevor Dion, Personal Representative of the Estate
of Bryce David Dion, deceased, appellant and
cross-appellee, v. City of Omaha, defendant
and third-party plaintiff, appellee and
cross-appellant, and Langley Productions,
Inc., a foreign corporation organized
under the laws of California,
third-party defendant, appellee
and cross-appellee.

___ N.W.2d ___

Filed May 6, 2022.    No. S-21-545.

1. **Political Subdivisions Tort Claims Act.** Whether the allegations made
   by a plaintiff set forth claims which are precluded by exemptions under
   the Political Subdivisions Tort Claims Act presents a question of law.
2. **Judgments: Appeal and Error.** When reviewing questions of law, an
   appellate court has an obligation to resolve the questions independently
   of the conclusion reached by the trial court.
3. **Statutes: Appeal and Error.** Statutory interpretation presents a ques-
   tion of law, for which an appellate court has an obligation to reach
   an independent conclusion irrespective of the decision made by the
   court below.
4. **Political Subdivisions Tort Claims Act: Appeal and Error.** In actions
   brought pursuant to the Political Subdivisions Tort Claims Act, the fac-
   tual findings of a trial court will not be disturbed on appeal unless they
   are clearly wrong.
5. **Contracts.** The interpretation of a contract and whether the contract is
   ambiguous are questions law subject to independent review.
6. **Political Subdivisions Tort Claims Act: Dismissal and Nonsuit:
   Immunity.** If an exemption under Neb. Rev. Stat. § 13-910 (Reissue
   2012) applies, the political subdivision is immune from the claim and the
   proper remedy is to dismiss it for lack of subject matter jurisdiction.

7. **Statutes: Immunity: Waiver.** Statutes purporting to waive the protection of sovereign immunity are to be strictly construed in favor of the sovereign and against waiver.

8. **Political Subdivisions Tort Claims Act: Immunity: Waiver.** Courts apply a broad reading to statutory exemptions from a waiver of sovereign immunity, such as Neb. Rev. Stat. § 13-910(7) (Reissue 2012).

9. **Statutes: Immunity: Waiver.** A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction.

10. **Political Subdivisions Tort Claims Act: Appeal and Error.** No matter how a tort claim has been framed and regardless of the assailant's employment status, appellate courts have variously described that the intentional tort exemption applies whenever the claim stems from, arises out of, is inextricably linked to, is essential to, and would not exist without, one of the underlying intentional torts listed in Neb. Rev. Stat. § 13-910(7) (Reissue 2012).

11. **Complaints: Words and Phrases.** The gravamen is the substantial point or essence of a claim, grievance, or complaint and is found by examining and construing the substance of the allegations of the complaint as a whole without regard to the form or label adopted by the pleader or the relief demanded.

12. **Political Subdivisions Tort Claims Act: Immunity: Waiver: Complaints.** To determine the gravamen of the complaint, courts look to whether the plaintiff has alleged an injury independent of that caused by the excluded acts, i.e., that the injury is linked to a duty to act that is entirely separate from the acts expressly excluded from the statutory waiver of sovereign immunity.

13. **Battery: Appeal and Error.** Although appellate courts have sometimes described battery as any intentional, unlawful physical violence or contact inflicted on a human being without his or her consent, "unlawful" in that context simply means unconsented to.

14. **Torts: Liability: Intent.** A person will be liable for intentional tortious conduct directed at one person but which unintentionally results to harm to another person.

15. **Police Officers and Sheriffs: Liability.** A law enforcement officer is not liable to a third person harmed by a stray bullet when shooting at an escaping felon when there was little or no probability that any person other than the felon would be hit.

16. **Police Officers and Sheriffs.** A law enforcement officer is unprivileged to shoot at an escaping felon if it was unreasonable under the circumstances to risk causing grave harm to bystanders.

17. **Claims: Immunity.** A plaintiff cannot allege that the harmful or offensive contact causing the injuries the plaintiff seeks to recover for are privileged for the purpose of sovereign immunity while unprivileged for the purpose of determining the merits of the claim.

18. **Political Subdivisions Tort Claims Act: Battery: Intent.** If recovery for the injury in question depends upon an intentional, harmful, or offensive contact's being unprivileged, then it depends also upon a battery and is "arising from" it for purposes of Neb. Rev. Stat. § 13-910(7) (Reissue 2012). In such circumstances, the claim does not allege an injury independent of that caused by one of the excluded intentional torts.

19. **Moot Question.** Mootness refers to events occurring after the filing of a suit which eradicate the requisite personal interest in the dispute's resolution that existed at the beginning of the litigation.

20. **Contracts: Negligence: Liability: Presumptions.** There is a presumption against any intention to indemnify against an indemnitee's own negligence.

21. **Contracts: Negligence: Liability.** Clauses indemnifying the indemnitee for the indemnitee's own negligence are strictly construed against the claimant.

22. **Contracts: Negligence: Liability: Intent.** To ensure that the parties truly intended to indemnify for the indemnitee's negligence, a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from the indemnitee's own negligence unless the intention of the parties is clearly and unambiguously expressed.

23. ____: ____: ____: ____. The intention to indemnify the indemnitee for the indemnitee's own negligence need not be stated through a specific reference to indemnification against liability for negligence; but, if not so expressed, it must otherwise clearly appear from the language used or from a determination that no other meaning could be ascribed to the contract such that the court is firmly convinced that such interpretation reflects the intention of the parties.

24. ____: ____: ____: ____. To determine if the contract indemnifies against an indemnitee's own negligence, courts generally first examine whether the express language covers the indemnitee's own negligence and, second, whether the contract contains clear and unequivocal language that it was the parties' intention to cover the indemnitee's own negligence.

25. **Contracts: Negligence: Liability.** Standing alone, general, broad, and seemingly all-inclusive language is simply not sufficient to impose liability for the negligence of the indemnitee.

Appeal from the District Court for Douglas County: James M. Masteller, Judge. Affirmed.

Christian T. Williams, Brian E. Jorde, and David A. Domina, of Domina Law Group, P.C., L.L.O., for appellant.

Ryan J. Wiesen, Assistant Omaha City Attorney, for appellee City of Omaha.

Bruce A. Smith and Audrey R. Svane, of Woods Aitken, L.L.P., for appellee Langley Productions, Inc.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

A member of a television crew that was filming law enforcement activities was shot and killed at the scene of a robbery when officers fired their weapons at the suspect. The filming was conducted pursuant to a contract between the city and the television production company. The estate of the crew member who died sued the city for wrongful death. The city brought a third-party claim against the production company for breach of alleged contractual agreements to defend, indemnify, and insure the city. Following summary judgment against the city on its claim against the production company for breach of contract, a bench trial was held on the estate's wrongful death claim. A verdict was rendered in favor of the city. The court reasoned that the wrongful death action arose out of a battery and therefore was barred by sovereign immunity. Alternatively, the court found the estate had failed to prove the elements of breach and proximate causation. The estate appeals, and the city cross-appeals.

## II. BACKGROUND

Bryce David Dion worked for Langley Productions, Inc. (Langley), as a sound technician on the filming crew for the "COPS" television program. In the summer of 2014, Dion

was part of a two-person crew that, pursuant to an agreement between Langley and the City of Omaha (City), rode with and filmed the activities of two Omaha Police Department (OPD) officers. On August 26, 2014, while at the scene of a robbery in progress at a fast-food restaurant, Dion was hit by a bullet fired by OPD officers as they aimed and shot at the suspect after the suspect had threatened the officers by pointing what appeared to be a firearm at them. It was later determined that the handgun the suspect brandished was not, in fact, an actual firearm.

## 1. Agreement

Under the agreement signed by the City's mayor and the producer of COPS (Agreement), the City granted Langley access to OPD and its personnel. It allowed video and audio to be recorded during production "in all circumstances and locations" and gave the COPS crew "reasonable access to officers and situations such officers encounter." All film activity was "subject to and under [the] control of the [OPD] officer in charge," and Langley agreed to "comply with all instructions and restrictions as directed by [OPD]."

Paragraph 5 of the Agreement provided for a duty to defend and indemnify as follows:

> [Langley] agrees that it shall indemnify, defend and hold harmless, the City, its officers, agents, employees and administrators from and against any and all claims for damage and liability for injury to or death of persons; and for damage to or destruction of property occurring during and arising out of the acts or omission of [Langley], its employees and/or agents with regard to [Langley's] filming; and shall pay the reasonable cost of defending lawsuits resulting therefrom, including, but not limited to, reasonable attorneys fees, court costs and any judgment awarded to a third party as the result of such suit. In accordance with the foregoing, [Langley] also agrees to indemnify, defend and hold harmless the City from

and against all claims related to intellectual property claims arising out of [Langley's] filming activities.

Another portion of paragraph 5 stated that the City shall be named an additional insured on Langley's comprehensive general liability insurance policy.

## 2. Complaint for Wrongful Death

Dion's estate (Estate) filed a wrongful death action against the City, alleging that OPD owed Dion a special duty of care and protection and that its police officers negligently shot Dion while acting within the scope of their employment.

The Estate alleged, summarized, that OPD did not provide adequate protection of the filming crew through various alleged deficiencies of general training and instruction of OPD personnel and the crew. It also alleged that on August 26, 2014, OPD failed to adequately monitor and communicate to other officers the filming crew's whereabouts, give the filming crew adequate instructions for its safety, or carry out OPD duties in a manner that accounted for the presence of the filming crew at the scene. Finally, the Estate alleged that the OPD officers at the scene failed to identify the proper target before discharging their firearms, used excessive force, and acted unreasonably in light of the presence of innocent bystanders.

Prior to filing its action, the Estate had timely filed a notice of its claim in accordance with the Political Subdivisions Tort Claims Act (PSTCA). The claim was not acted upon by the City and was withdrawn more than 6 months after it was filed.

The City filed an answer affirmatively alleging sovereign immunity as a defense, on the grounds that the Estate's claim arose out of an intentional tort of battery. Alternatively, the City alleged that the use of force was objectively reasonable and privileged. Further, the City alleged that Dion assumed the risk associated with filming law enforcement personnel while on duty and that Dion voluntarily and without notifying the officers had placed himself within an active armed-robbery situation.

### 3. Third-Party Complaint Against Langley

The City filed a third-party complaint against Langley for breach of contract. It also brought a claim against Langley for promissory estoppel, which is not at issue in this appeal.

The City had sent a letter to Langley requesting that it forward the wrongful death complaint to its insurance carrier for defense against the Estate's claims. Langley's insurance carrier thereafter notified the City it was denying the City's request for defense and indemnification under the commercial general liability policy issued to Langley.

The City alleged in its third-party complaint that Langley was contractually required to indemnify the City against any claim for damages and liability for injury to or death of persons, defend the City against any claim for injury to or death of persons, name the City as an additional insured in Langley's general liability insurance policy, and abide by a duty of fair dealing.

### 4. Motions For Summary Judgment

The City moved for summary judgment against the Estate on the grounds that it was immune from the wrongful death suit, which arose out of a battery, as set forth in Neb. Rev. Stat. § 13-910(7) (Reissue 2012), which provides in relevant part that the PSTCA shall not apply to "[a]ny claim arising out of assault, battery, false arrest, false imprisonment, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

Langley moved for summary judgment against the City on the third-party claims against it. The City filed a cross-motion for summary judgment against Langley.

#### (a) Wrongful Death

The district court denied summary judgment in favor of the City on the Estate's wrongful death action.

At the hearing on the motion, the City had argued that the historical facts were undisputed and that a battery occurred by virtue of the officers' intentional act of firing at the

suspect. The City relied on a standard from the Restatement (Second) of Torts,[1] quoted in *Britton v. City of Crawford*,[2] that an actor is subject to liability to another for battery if (1) he or she acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (2) a harmful contact with the person of the other directly or indirectly results. The City argued that it was undisputed that the City intended to cause harmful contact to the suspect, a third person, which indirectly caused harmful contact to Dion.

The Estate argued, among other things, that the actions of the officers lawfully using their firearms in the course of duty would not constitute an intentional tort. It was also discussed that the officers were exonerated by a grand jury of any criminal activity in connection with placing the filming crew in harm's way.

In denying summary judgment against the Estate, the court reasoned that our opinion in *Phillips v. Liberty Mut. Ins. Co.*[3] stands for the proposition that actions for injuries to bystanders by law enforcement in the course of pursuing a suspect are not immune under § 13-910(7). And the court found there was a genuine issue as to whether OPD acted reasonably in relation to the events leading to Dion's death.

### (b) Breach of Contract

The court granted Langley's motion for summary judgment as to the City's claim against Langley for breach of contract, which was based on paragraph 5 of the Agreement. The court reasoned that the contract did not affirmatively and unambiguously protect the City from its own negligence and that the duty to be named an additional insured was immaterial because Langley's policy included only operations performed by Langley or on Langley's behalf and excluded

---

[1] Restatement (Second) of Torts § 13 (1965).

[2] *Britton v. City of Crawford*, 282 Neb. 374, 803 N.W.2d 508 (2011).

[3] *Phillips v. Liberty Mut. Ins. Co.*, 293 Neb. 123, 876 N.W.2d 361 (2016).

bodily injury arising out of operations performed for the state or municipality.

### (c) Promissory Estoppel

The court denied Langley's motion for summary judgment on the City's claim for promissory estoppel. It generally denied the City's cross-motion for summary judgment against Langley.

### 5. Wrongful Death Verdict

The court bifurcated for separate bench trials the Estate's wrongful death action against the City and the City's third-party action against Langley for promissory estoppel. The trials were held before a different judge than the judge who presided over the summary judgment hearing. The court ultimately issued a verdict in favor of the City on the Estate's wrongful death claim, first, on the grounds of sovereign immunity and, alternatively, on the failure to prove negligence.

### (a) Findings of Fact

In its order following the trial on the Estate's wrongful death claim, the court summarized the relevant evidence and made findings of historical facts.

The court found that the only explicit restriction OPD and the City placed upon the filming crew was that it was not to exit the patrol car during large crowd disturbances involving more than 10 people. Otherwise, OPD and the City generally expected that the crew would follow and observe the officers' orders.

On the day in question, Dion and Mike Lee, the cameraman for the two-person filming crew, were riding with OPD officers Brooks Riley and Jason Wilhelm. The court found that Dion had ridden with Riley and Wilhelm several times previously over the course of the preceding 8 weeks and had developed a cooperative and professional relationship with them.

The officers were aware that the filming crew always exited the patrol car and followed them everywhere they

went while on duty. Dion had advised the officers they should act like the crew was not there, although the officers testified the crew would take direction from officers and follow officers' commands or directives.

On the night in question, OPD detective Darren Cunningham radioed that a robbery suspect had entered a fast-food restaurant. Cunningham waited for responding officers to arrive in order to set up a perimeter around the restaurant. Riley and Wilhelm, who were only a few blocks away, proceeded directly to the scene.

When Riley and Wilhelm arrived, they exited their patrol car. A civilian in the parking lot yelled to Wilhelm and Riley, "Help, help, they need help inside." Riley and Wilhelm did not give any instructions to Dion and Lee. As Riley and Wilhelm approached Cunningham, they did not identify Dion and Lee to Cunningham, who assumed they were law enforcement, because they were wearing dark clothing and were with Riley and Wilhelm. Cunningham did not observe the video camera, boom microphone, and audio equipment carried by Dion and Lee. Dion and Lee did not wear any clothing identifying themselves as media.

Cunningham and Riley entered the restaurant on the east side of the building through the south vestibule door, followed by Lee. Wilhelm circled around the building to enter through the western entrance.

There was a customer at the service counter and an employee standing behind the service counter handing money from the cash register to the suspect, who was behind the counter. Riley testified he saw neither the customer nor the employee. Cunningham and Wilhelm saw the employee.

When Cunningham and Riley entered the area behind the counter and confronted the suspect, the suspect drew what appeared to be a black handgun, pointed it at Cunningham and Riley, and pulled the trigger. Although the suspect's weapon was later determined to be a pellet gun, the court found that the officers reasonably believed it was a real firearm.

Cunningham discharged his firearm once and retreated into the hallway in order to avoid endangering the employee, who was in his line of fire. The suspect also exited into the hallway, where he again pointed his firearm at Cunningham. Cunningham attempted to discharge his firearm at the suspect, but it briefly malfunctioned.

The suspect fled toward the east vestibule doors, pointing his firearm at Riley, who, in turn, discharged his firearm at the suspect. Wilhelm, seeing the suspect attempting what he believed to be deadly force against Cunningham and Riley, also discharged his firearm at the suspect.

The three officers discharged their firearms at the suspect as he exited the restaurant through the east vestibule doors and ran through the parking lot. The suspect was no longer firing what was believed to be a deadly weapon at that time, but the officers believed the suspect continued to pose a threat to their lives and the lives of others, including other officers who could be responding to assist and the members of the public at large.

The court noted that all three officers testified that they were aiming and shooting directly at the suspect while he fled. The officers testified that they did not accidentally pull the trigger of their guns or drop their firearms, but instead intended to use deadly force against the suspect. The court found that the officers' shots were fired in a directed manner and not in a haphazard manner.

The court found that none of the officers saw Dion at any point after entering the scene and that they were not aware of where Dion might be. The three officers were not even aware Dion had entered the restaurant until after they had all ceased discharging their weapons. All three officers testified that had they seen Dion within their line of fire, they would not have discharged their firearms and would instead have changed their position so as to obtain a clear line of fire toward the suspect. The court specifically found the officers' testimony to be credible and supported by the evidence.

The court found that although the suspect was initially in the vicinity of an employee and a customer, he moved away from both in his attempt to escape. The court found that although there were civilians present in the northeast corner of the restaurant's parking lot, civilians were not congregating around the east entrance when the suspect fled, and there was no evidence the suspect was near any civilians outside.

The officers discharged their weapons a combined total of 36 times. The majority of the bullets, 24, were fired as the suspect exited through the east vestibule. It could not be determined which officer fired the single bullet that killed Dion. Dion was later found slumped on the floor in the middle of the east vestibule. However, the court found there was no evidence as to Dion's precise location or body positioning when he sustained the bullet wound. Nor, found the court, did the evidence rule out the possibility that Dion was struck by a bullet that had ricocheted or initially struck the suspect.

### (b) Sovereign Immunity

The court concluded, as a threshold matter, that the Estate's action was barred by sovereign immunity. The court did not agree with the prior judge's reading of *Phillips* as it pertained to § 13-910(7).[4]

The court concluded that the elements of battery had been met because the officers intended to cause harmful contact with the suspect, which resulted in harmful contact with Dion. The court relied on the definition of battery from *Britton* as an infliction of unconsented contact with another,[5] as well as case law from other jurisdictions holding that under a theory of transferred intent, an actor may still be found liable for battery when the harmful contact occurs to a third person

[4] See *Phillips v. Liberty Mut. Ins. Co., supra* note 3.

[5] *Britton v. City of Crawford, supra* note 2.

who was not the intended target of the contact.[6] The court also relied upon the Restatement (Second) of Torts' statement that an actor is liable for battery if the actor intended to cause harmful or offensive contact with the person of the other or a third person, or imminent apprehension of such contact, and a harmful contact with the person of the other directly or indirectly results.[7] In this analysis, the court did not consider whether the officers could have committed a battery if their acts of shooting at the suspect were privileged.

The court reasoned that to fall under § 13-910(7), the underlying action need not be an action "for" one of the listed intentional torts, but need only be any claim "arising out of" one of those intentional torts. Even if the complaint alleged acts of negligence, concluded the court, the wrongful death action was inextricably linked to a battery and thus was barred by sovereign immunity.

### (c) Negligence

Alternatively, the court concluded that the Estate had failed to prove negligence.

The court found no special relationship between Dion and the City creating a heightened duty of care. Rather, it found that OPD owed Dion an ordinary duty of reasonable care under the circumstances. The court reasoned that Dion was neither a party nor a third-party beneficiary to the Agreement and that case law did not generally support a special duty to protect a bystander from the intentional conduct of an employee of the defendant.

The court utilized negligence propositions from *Phillips* describing the balancing of the duty of law enforcement to apprehend violators against the duty of care to the general

---

[6] See, *Hensley on behalf of North Carolina v. Price*, 876 F.3d 573 (4th Cir. 2017); *Hensley v. Suttles*, 167 F. Supp. 3d 753 (W.D.N.C. 2016); *Alteiri v. Colasso*, 168 Conn. 329, 362 A.2d 798 (1975).

[7] See Restatement, *supra* note 1.

public, as well as the privilege to use reasonable force in effecting a lawful arrest, which extends to harm caused to innocent bystanders unless the officers' actions were unreasonable under the circumstances.[8] The court found under these propositions that the officers acted reasonably. Therefore, the officers did not breach the applicable duty of care.

The court rejected the Estate's argument that the officers should have refrained from engaging the suspect until they affirmatively ascertained Dion's whereabouts. The court stated:

> It is unreasonable to expect an officer, when faced with a suspect who is within close proximity to the officer and pulling the trigger on what appears to be a real firearm, to simply stand there or try to take cover merely because a third-person, who the officer does not observe, but who could possibly be somewhere in the vicinity, may be present.

The court also rejected the Estate's contention that the suspect had fled through a "crowded thoroughfare," given the lack of evidence that civilians were in the parts of the parking lot affected by the line of fire.

In any event, the court weighed the surrounding circumstances for determining whether the act of shooting into a crowded thoroughfare is privileged, including the nature of the crime, the harm that may ensue if the officer does not act, and the officer's skill in the use of the weapon. The court found these factors weighed heavily in favor of the City. The suspect was engaging in violence, including what the officers reasonably believed to be attempted homicide; it was reasonable to conclude that such a suspect might also shoot at other responding officers or innocent civilians; and all three officers specifically aimed at the suspect and not merely in his general vicinity.

The court also found that the Estate had failed to prove proximate causation. The court explained that there was no

---

[8] See *Phillips v. Liberty Mut. Ins. Co., supra* note 3.

evidence for it to come to a conclusion, absent speculation or conjecture, that Dion's death was caused by any failure of the City or OPD to advise him to remain outside the restaurant or to wear any clothing that identified him as media.

### 6. Verdict on Promissory Estoppel

The court found that in light of its verdict against the Estate on its wrongful death action, there was no actual case or controversy with respect to a claim under promissory estoppel for indemnification. As for the duty to defend, the court found that promissory estoppel, which was based on oral statements made before the written contract, was not a viable theory of recovery because the written contract covered the same subject matter. The court alternatively found that the alleged statements on Langley's behalf were too vague and indefinite to support a claim for promissory estoppel. Finally, the court found that it was not reasonable for the City to rely upon statements made on Langley's behalf during negotiations of a contract.

## III. ASSIGNMENTS OF ERROR

The Estate assigns that the district court erred by (1) dismissing Dion's claims against the City, ruling that the PSTCA barred those claims; (2) ruling Dion's claims arose out of an intentional tort for which sovereign immunity is not waived by the PSTCA; (3) ruling that OPD acted reasonably at all times; and (4) holding that OPD officers did not owe Dion a heightened duty of care.

On cross-appeal, the City assigns that the district court erred by (1) holding as a matter of law that the indemnification and defense provisions of the Agreement were ambiguous, (2) holding as a matter of law that the indemnification and defense provisions in the Agreement were unenforceable, and (3) dismissing with prejudice the City's third-party breach of contract claims against Langley seeking indemnification and defense of the Estate's claims against the City. The City assigns as error the court's order rendering its verdict on

promissory estoppel only "to the extent it became a final[,] appealable order enabling appellate review of the [order granting summary judgment in favor of Langley on its breach of contract claim]."

## IV. STANDARD OF REVIEW

[1] Whether the allegations made by a plaintiff set forth claims which are precluded by exemptions under the PSTCA presents a question of law.[9]

[2] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[10]

[3] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[11]

[4] In actions brought pursuant to the PSTCA, the factual findings of a trial court will not be disturbed on appeal unless they are clearly wrong.[12]

[5] The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review.[13]

## V. ANALYSIS

The Estate appeals from the judgment in the wrongful death action, which dismissed the action with prejudice. The City cross-appeals the court's order on summary judgment dismissing with prejudice its third-party claim against Langley for breach of contract. We first address the Estate's appeal in the wrongful death action.

---

[9] *Edwards v. Douglas County*, 308 Neb. 259, 953 N.W.2d 744 (2021).

[10] *Id.*

[11] *Id.*

[12] *Stonacek v. City of Lincoln*, 279 Neb. 869, 782 N.W.2d 900 (2010).

[13] *Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019).

## 1. Wrongful Death

As a threshold issue, we must determine if the Estate's wrongful death action was barred by sovereign immunity. Neb. Const. art. V, § 22, provides: "The state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought." The Estate asserts that sovereign immunity was waived by the PSTCA.[14]

Under the PSTCA, a political subdivision has no liability for the torts of its officers, agents, or employees, "except to the extent, and only to the extent, provided by the [PSTCA]."[15] In suits brought under the PSTCA, a political subdivision is "liable in the same manner and to the same extent as a private individual under like circumstances," except "as otherwise provided in the [PSTCA]."[16]

[6] The Legislature has allowed through the PSTCA a limited waiver of a political subdivision's sovereign immunity with respect to some, but not all, types of tort claims.[17] Section 13-903 defines a "[t]ort claim" as

> any claim against a political subdivision for money only on account of damage to or loss of property or on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of the political subdivision, while acting within the scope of his or her office or employment, under circumstances in which the political subdivision, if a private person, would be liable to the claimant for such damage, loss, injury, or death but shall not include any claim accruing before January 1, 1970.

Section 13-910, in turn, exempts certain tort claims from the limited waiver of sovereign immunity of the PSTCA.

---

[14] See Neb. Rev. Stat. §§ 13-901 to 13-928 (Reissue 2012).

[15] § 13-902.

[16] § 13-908.

[17] *Edwards v. Douglas County, supra* note 9.

If an exemption under § 13-910 applies, the political subdivision is immune from the claim and the proper remedy is to dismiss it for lack of subject matter jurisdiction.[18]

### (a) Arising Out of Listed Intentional Tort

At issue in this case is subsection (7) of § 13-910. Under § 13-910(7), the PSTCA shall not apply to "[a]ny claim arising out of assault, battery, false arrest, false imprisonment, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Section 13-910(7) sets forth what is generally referred to as the "intentional tort" exemption.[19]

We have discussed that a similar intentional tort exemption from the waiver of sovereign immunity under the Federal Tort Claims Act[20] reflects public policy determinations against allowing government employees to engage at the government's expense in lawless activities that are practically, if not legally, outside the scope of their proper functions.[21] This was deemed contrary to the promotion of high standards of performance by a sovereign's employees.[22] Also, it was determined to be against public policy to expose the public fisc to intentional tort claims, which are often unwieldy, being easy for plaintiffs to exaggerate and difficult to defend.[23] The Legislature implicitly adopted similar public policy stances through the intentional tort exemptions of the PSTCA and the State Tort Claims Act.[24] Such public policy is the province of the Legislature rather than the courts.[25]

---

[18] See *id.*

[19] See *id*.

[20] See 28 U.S.C. §§ 1346(b) and 2671 to 2680 (2018).

[21] See *Jill B. & Travis B. v. State*, 297 Neb. 57, 899 N.W.2d 241 (2017).

[22] See *id.*

[23] See *id.*

[24] See *id.*

[25] See *id.*

[7-9] Statutes purporting to waive the protection of sovereign immunity are to be strictly construed in favor of the sovereign and against waiver.[26] As a corollary to this canon of construction, and in order to strictly construe the PSTCA against a waiver of sovereign immunity, we apply a broad reading to statutory exemptions from a waiver of sovereign immunity, such as § 13-910(7).[27] A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction.[28]

We recently observed in *Edwards v. Douglas County*[29] that the language used by the Legislature in § 13-910(7) is "strikingly broad" and that "without qualification or limitation, it exempts from the waiver of sovereign immunity '[a]ny claim arising out of'" the listed intentional torts.

[10] No matter how a tort claim has been framed and regardless of the assailant's employment status, we have variously described that the intentional tort exemption applies whenever the claim stems from, arises out of, is inextricably linked to, is essential to, and would not exist without one of the underlying intentional torts listed in § 13-910(7).[30] We held in *Edwards*, "All of these articulations speak to the same point: when a tort claim against the government seeks to recover damages for personal injury or death stemming from an assault, the claim necessarily 'arises out of assault' and is barred by the intentional tort exemption under the PSTCA."[31]

[11,12] In the context of the other intentional torts specified in § 13-910(7), such as for any claim arising out of misrepresentation or deceit, we have described that under

---

[26] *Edwards v. Douglas County, supra* note 9.

[27] See *id.*

[28] *Id.*

[29] *Id.* at 276, 953 N.W.2d at 755-56.

[30] See *Edwards v. Douglas County, supra* note 9.

[31] *Id.* at 277-78, 953 N.W.2d at 756.

the "'gravamen of the complaint test,'" an appellate court examines the underlying substance of a dispute in order to determine whether sovereign immunity lies.[32] In general, the "gravamen" is the "substantial point or essence of a claim, grievance, or complaint"[33] and is found by examining and construing the substance of the allegations of the complaint as a whole without regard to the form or label adopted by the pleader or the relief demanded.[34] Thus, to determine the gravamen of the complaint, we look to whether the plaintiff has alleged an injury independent of that caused by the excluded acts, i.e., that the injury is linked to a duty to act that is entirely separate from the acts expressly excluded from the statutory waiver of sovereign immunity.[35]

In *Edwards*, the plaintiff sought to recover for injuries directly incurred from what was undisputed to be an assault by a former boyfriend.[36] We ultimately held that the action based on allegations that the county negligently handled emergency telephone calls and did not arrive in time to prevent or stop the assault on the plaintiff was inextricably linked to an assault and, thus, was exempted under § 13-910(7) from the waiver of sovereign immunity of the PSTCA. We said that although it was "conceivable there could be circumstances where the claim is so attenuated from an assault that it cannot fairly be characterized as arising out of the assault," this was not such a claim.[37] Plaintiffs cannot circumvent the

---

[32] *Amend v. Nebraska Pub. Serv. Comm.*, 298 Neb. 617, 627, 905 N.W.2d 551, 559 (2018). See, also, *Jill B. & Travis B. v. State, supra* note 21; *Zawaideh v. Nebraska Dept. of Health & Human Servs.*, 285 Neb. 48, 825 N.W.2d 204 (2013); *Stonacek v. City of Lincoln, supra* note 12.

[33] Black's Law Dictionary 845 (11th ed. 2019).

[34] See 1A C.J.S. *Actions* § 121 (2016).

[35] See *Stonacek v. City of Lincoln, supra* note 12.

[36] *Edwards v. Douglas County, supra* note 9.

[37] *Id.* at 279, 953 N.W.2d at 757.

exemption of § 13-910(7) through artful pleading that relies on a semantic recasting of events.[38]

### (b) Elements of Battery

[13] The district court in this case concluded that the Estate's action fell under § 13-910(7) because it arose out of a battery. The intentional tort of battery is defined as an actual infliction of an unconsented injury upon or unconsented contact with another.[39] A harmful contact intentionally done is the essence of battery.[40] This is consistent with the Restatement (Second) of Torts, which has been relied upon by this court and provides:

> An actor is subject to liability to another for battery if
>
> (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
>
> (b) a harmful contact with the person of the other directly or indirectly results.[41]

We observed in *Britton* that the Restatement (Second) of Torts does not use the term "unlawful" in its definition of battery.[42] In any event, although we have sometimes described battery as any intentional, unlawful physical violence or contact inflicted on a human being without his or her consent, "unlawful" in that context simply means unconsented to.[43]

In the comments to the Restatement (Second) of Torts, it is clarified that the meaning of the term "intending" goes only to the act itself.[44] It is immaterial that the actor is not

---

[38] *Id.*

[39] *Britton v. City of Crawford, supra* note 2.

[40] *Id.*

[41] Restatement, *supra* note 1, § 13 at 25.

[42] See *Britton v. City of Crawford, supra* note 2.

[43] See *id.*

[44] See Restatement, *supra* note 1, § 13, comment c.

inspired by any personal hostility to the other or a desire to injure anyone.[45] Thus, for example, so long as the other has not actually consented, a defendant who intentionally inflicts bodily harm upon another as a practical joke is not immune from liability, even if the actor erroneously believed the other would regard it as a joke or erroneously believed that the other consented to the contact.[46]

The comments to the Restatement (Second) of Torts also clarify the meaning of the phrase "subject to liability" and state that the defendant's act must be a "legal cause" of the contact with the plaintiffs.[47] Such liability is defeated by any privilege available to the defendant.[48]

### (c) Negligence Actions Arising Out of Battery

In several cases, we have held that plaintiffs' negligence actions arose from a battery and thus fell within the scope of § 13-910(7) and were barred by sovereign immunity.[49] In *Britton*, for example, we affirmed the lower court's order granting what was effectively a motion for summary judgment in favor of the political subdivision on the grounds that the claim, although framed as negligence, fell under the intentional tort exemption to the limited waiver of sovereign immunity under the PSTCA, because it arose out of a battery.[50]

The claim derived from the death of the suspect in *Britton* after law enforcement shot him when he refused to

---

[45] See *id.*

[46] See *id.*

[47] See *id.*, comment d. at 25.

[48] *Id.*

[49] See, *Britton v. City of Crawford, supra* note 2; *Rutledge v. City of Kimball*, 304 Neb. 593, 935 N.W.2d 746 (2019); *City of Lincoln v. County of Lancaster*, 297 Neb. 256, 898 N.W.2d 374 (2017). See, also, *Williams v. State*, 310 Neb. 588, 967 N.W.2d 677 (2021); *Moser v. State*, 307 Neb. 18, 948 N.W.2d 194 (2020); *Johnson v. State*, 270 Neb. 316, 700 N.W.2d 620 (2005); *Pieper v. State*, 29 Neb. App. 912, 962 N.W.2d 715 (2021).

[50] *Britton v. City of Crawford, supra* note 2.

comply with directives to show his hands and drop his weapon and instead pointed his weapon at the officers. The action alleged law enforcement had been negligent in the techniques implemented in a barricaded suspect situation, which negligence ultimately led to the death of the suspect when an officer shot him.

We explained that although the claim of the suspect's estate may have been "for" negligence, the injuries the estate sued the political subdivision for ultimately stemmed from a battery, an intentional tort. We reasoned, "While other factors may have contributed to the situation which resulted in [the suspect's] death, but for the battery, there would have been no claim."[51] Even if negligence was a factor in the suspect's death, no semantic recasting of events could alter the fact that the shooting that ultimately caused the suspect's death was inextricably linked to a battery.[52]

In so holding in *Britton*, we specifically rejected the argument that because the officer had been found not guilty of assault, on the grounds of self-defense, the officer's conduct did not fall under the intentional tort of battery and the exception found in § 13-910(7). Noting that we had not before considered whether an affirmative defense would remove an intentional tort from coverage under the exception, we observed that, on its face, § 13-910(7) does not contemplate whether such intentional acts are legally justified. Nor does the exception state that the waiver of sovereign immunity only applies to claims based on intentional torts for which the actor could be held liable. We also observed that we have consistently recognized that the key requirement of the intentional torts exception is that the actor intended the conduct. We ultimately held that in deciding whether the plaintiff's claim arose out of a battery, "[w]e need not determine whether the actor ultimately could be held liable for any damage

---

[51] *Id.* at 386, 803 N.W.2d at 518.

[52] See *id.*

resulting from the battery, based on the presence or absence of affirmative defenses."[53]

#### (d) Estate's Arguments

We have not before specifically addressed whether injury to a bystander in the course of law enforcement's pursuit of or engagement with a suspect arises from a battery for purposes of § 13-910(7). On appeal, the Estate presents four arguments as to why it believes that its wrongful death action did not arise out of a battery and that the district court erred in concluding differently. First, the Estate points out that it did not sue for battery, but, rather, sued for negligence. Second, the Estate asserts that the elements of battery were not met in this case because the officers alleged that discharging lethal force at the suspect was not wrongful and was privileged. Third, the Estate asserts that the injuries Dion suffered did not arise from a battery, because the officers intended to shoot the suspect and not Dion, and that transferred intent does not apply to § 13-910(7). Fourth, the Estate asserts that our opinion in *Phillips* indicates that actions to recover for injuries to bystanders incurred in the course of law enforcement's pursuit or engagement with a suspect do not arise from a battery for purposes of § 13-910(7).[54]

#### i. Sued "For" Versus Arises From

As stated in *Edwards* and *Britton*, what the plaintiff sues "for" is not determinative of whether that action arose from a battery for purposes of § 13-910(7).[55] Thus, it does not matter that the Estate sued "for" negligence rather than a battery. The question is whether the injury the plaintiff seeks to recover for stems from, arises out of, is inextricably linked to, and would not exist without an underlying assault or

---

[53] *Id.* at 383, 803 N.W.2d at 516.

[54] See *Phillips v. Liberty Mut. Ins. Co., supra* note 3.

[55] See, *Edwards v. Douglas County, supra* note 9; *Britton v. City of Crawford, supra* note 2.

battery.[56] Stated another way, without regard to the form or label adopted by the pleader or the relief demanded, we look to the gravamen of the complaint to determine whether the plaintiff has alleged an injury independent of that caused by the excluded acts.

### ii. Phillips v. Liberty Mut. Ins. Co.

*Phillips* does not hold, as the Estate suggests, that when the underlying injury is to an innocent bystander of allegedly negligent law enforcement actions directed at a suspect, the plaintiff's action necessarily arises out of negligence rather than a battery. In *Phillips,* we affirmed a summary judgment in favor of the county in an action brought by an innocent bystander who was injured by being knocked over when deputies ran in pursuit of a person to effectuate an arrest.[57] The officers subsequently apprehended the person, forcing her hands off a doorknob that she was gripping, placing her on the ground, and handcuffing her.

While the Estate points out that in *Phillips* "no battery was found to have been committed by the police officer,"[58] this is a misleading characterization of our holding. We decided the appeal on the grounds that there was no negligence, despite the fact that the lower court had determined the claim was barred by sovereign immunity because it arose out of battery.

We noted in *Phillips* that the parties below had discussed the theory that the officers had committed a battery on the resisting person and that the officers' intent was transferred to the injured bystander. We then said, "based on their reading of *Britton v. City of Crawford*, [the parties below] placed considerable, arguably undue, emphasis on the 'intent' of the deputies."[59] But we did not elaborate or otherwise comment

---

[56] See *Edwards v. Douglas County, supra* note 9.

[57] See *Phillips v. Liberty Mut. Ins. Co., supra* note 3.

[58] Brief for appellant at 21.

[59] *Phillips v. Liberty Mut. Ins. Co., supra* note 3, 293 Neb. at 129, 876 N.W.2d at 367.

on whether an injury to a bystander during the pursuit of a suspect could fall under § 13-910(7).

We did not hold in *Phillips* that the district court's decision on sovereign immunity was wrong; we simply affirmed the order on the alternative ground that there was no genuine issue that the deputies did not act negligently. *Phillips* thus does not stand for the proposition that actions stemming from officers' injuring bystanders in the course of pursuing or engaging a suspect fall outside of § 13-910(7). To the extent *Phillips* could be read otherwise, we disapprove of any such reading.

### iii. Transferring Intent

We disagree with the Estate's contention that an action does not arise out of a battery whenever the actor did not intend contact with the plaintiff and instead intended the contact to a third party. While we have not previously addressed this scenario as it applies to § 13-910(7), the Restatement (Second) of Torts describes that a battery occurs when a person acts intending to cause a harmful or offensive contact with the person of the other *or a third person* and a harmful contact with the person of the other directly or indirectly results.[60]

[14] Further, the Restatement (Second) of Torts states in relevant part:

> (2) If an act is done with the intention of affecting a third person in the manner stated in Subsection (1) but causes an offensive bodily contact to another, the actor is subject to liability to such other as fully as though he intended so to affect him.[61]

Other authorities have explained that a person will be liable for intentional tortious conduct directed at one person but which unintentionally results to harm to another person.[62]

---

[60] *Restatement, supra* note 1.

[61] *Id.*, § 20 at 36.

[62] See Dan B. Dobbs, Law of Torts § 40 (2000).

That the officers did not intend to direct lethal force toward Dion does not mean Dion's death was not the result of a battery.

### iv. "Wrongful" Contact and Privileges

We turn lastly to the Estate's argument that the officers did not, in the first place, commit a battery of the suspect, of Dion, or of anyone else. The Estate argues that a battery does not occur if the unconsented to touching was privileged. And the Estate points out that the officers alleged as a defense that their actions of shooting at the suspect while he fled were privileged. Indeed, the court ultimately so found.

[15,16] The privilege at issue was described in *Phillips*, wherein we said, in the context of negligence, that if a law enforcement officer is privileged to shoot at an escaping felon, the law enforcement officer is not liable to a third person harmed by a stray bullet when shooting at an escaping felon when there was little or no probability that any person other than the felon would be hit.[63] In contrast, a law enforcement officer is unprivileged to shoot at an escaping felon if it was unreasonable under the circumstances to risk causing grave harm to bystanders.[64]

We quoted the Restatement (Second) of Torts concerning reasonable care with respect to innocent bystanders of police conduct and the confines of the law enforcement privilege:

"[I]f an actor is privileged to shoot at an escaping felon, he is not liable to a third person harmed by a stray bullet, if when he shot there was little or no probability that any person other than the felon would be hit. But when he shoots into a crowded thoroughfare, and unintentionally hits a passerby, his act is unprivileged if, in view of the surrounding conditions, including the nature

---

[63] *Phillips v. Liberty Mut. Ins. Co., supra* note 3.

[64] See *id.*

of the crime for which he seeks to arrest, recapture, or maintain custody, the harm which may ensue if he does not act, and his skill or lack of skill in the use of the weapon, it is unreasonable for him to take the chance of causing grave harm to bystanders."[65]

We held as a matter of law in *Phillips* that the deputies had a duty and were required to exercise that degree of care toward innocent persons as would be exercised by a reasonable deputy effectuating an arrest under the circumstances. We explained that reasonable force is an objective standard constituting that amount of force which an ordinary, prudent, and intelligent person with the knowledge and in the situation of the arresting police officer would have deemed necessary under the circumstances.[66] The context is important in determining the reasonableness of the action taken, but, broadly, the privilege to use reasonable force toward the arrestee extends to harm to an innocent bystander caused by force directed toward the arrestee unless under the circumstances it was unreasonable for law enforcement to take the chance of causing grave harm to bystanders.[67]

We explained that whether the deputies in *Phillips* acted unreasonably and breached their duty was a question of fact. However, noting that there was no evidence the deputies were using weapons or were chasing the person in a way that could be described as reckless, we held that there was no genuine issue that the deputies acted reasonably in chasing the person when she ran away. Nothing in the record indicated the deputies objectively should have realized their actions created an unreasonable risk of harm to any innocent third persons. Thus, the deputies were not negligent.

---

[65] *Id.* at 135-36, 876 N.W.2d at 370-71, quoting Restatement, *supra* note 1, § 137, comment c.

[66] See *Phillips v. Liberty Mut. Ins. Co., supra* note 3.

[67] See *id.*

As already set forth above, a privilege to make the contact is a defense to battery[68] such that an actor is not subject to liability for battery, because the actor's conduct was not the legal cause of the injury. This is sometimes referred to as a "privilege to commit battery,"[69] but it is perhaps more exact to state that it is a privilege to commit what would otherwise be a battery.[70] A privileged act is generally defined as one that would ordinarily be tortious, but which, under the circumstances, does not subject the actor to liability.[71]

Under the principle that, to be a battery, the acts must have been the legal cause of the injury, the Estate argues that if the relevant actions were privileged, there was no battery from which the injuries it seeks to recover for could have arisen for purposes of § 13-910(7). While under the facts presented in *Britton*, we rejected a similar argument, the Estate asks this court to overturn that holding.[72] We decline to do so. Even if there are hypothetical scenarios in which a privilege to commit the act causing the injury at issue could negate the requisite connection described in § 13-910(7) between the claim and the listed intentional torts, such was not the case in *Britton* and it is not the case here.

As *Phillips* illustrates, the same privilege the Estate argues makes the underlying conduct not a battery also defeats the negligence theories under which the Estate seeks to recover

---

[68] See *Baranowski v. City of Milwaukee*, 70 Wis. 2d 684, 235 N.W.2d 279 (1975).

[69] See, *Roberson v. Borough of Glassboro*, Cases Nos. 1:20-02765 and 1:20-02769, 2021 WL 5154000 (D.N.J. Nov. 5, 2021); *Gilmore v. Superior Court*, 230 Cal. App. 3d 416, 281 Cal. Rptr. 343 (1991); *Morrison v. Horseshoe Casino*, 2020 Ohio 4131, 157 N.E.3d 406 (2020); *Edwards v. City of Philadelphia*, 860 F.2d 568 (3rd Cir. 1988).

[70] See Restatement, *supra* note 1, ch. 4, topic 2, scope note (1965).

[71] *Gilmore v. Superior Court, supra* note 69.

[72] See *Britton v. City of Crawford, supra* note 2.

in its action against the City.[73] The Estate pled, among other things, that law enforcement officers failed to identify the correct and proper target before discharging their firearms, misdirected their gunfire, and used excessive deadly force. The theory litigated in the Estate's action was that when the suspect was fleeing through the east vestibule and no longer firing what was believed to be a deadly weapon, it was unreasonable under the circumstances to take the chance of causing grave harm to bystanders like Dion.

[17] A plaintiff cannot allege that the harmful or offensive contact causing the injuries the plaintiff seeks to recover for are privileged for the purpose of sovereign immunity while unprivileged for the purpose of determining the merits of the claim. Logically, an act is not simultaneously privileged and unprivileged. The Estate concedes its wrongful death claim depends upon the theory that the officers' acts of firing at the suspect were no longer privileged when the officers fired the bullet that killed Dion. Thus, no matter how framed, the Estate's negligence claim depends upon allegations that the injuries were caused by unprivileged harmful or offensive contact, which in substance is an allegation that the injuries were caused by a battery.

[18] In sum, the underlying substance of the Estate's claim is that Dion's death arose out of a battery. If recovery for the injury in question depends upon an intentional, harmful, or offensive contact's being unprivileged, then it depends also upon a battery and is "arising from" it for purposes of § 13-910(7). In such circumstances, the claim does not allege an injury independent of that caused by one of the excluded intentional torts. We need not decide whether a claim arises out of a battery for purposes of § 13-910(7) when recovery for that claim does not depend upon the offensive contact being unprivileged, because that scenario is not presented in this appeal.

---

[73] See *Phillips v. Liberty Mut. Ins. Co., supra* note 3.

### (e) Conclusion on Wrongful Death Claim

We are unpersuaded by the four arguments presented on appeal by the Estate in support of its assertion that its wrongful death claim did not arise out of battery for purposes of § 13-910(7). We affirm the judgment of the district court that the Estate's wrongful death action is barred by sovereign immunity. We turn to the City's cross-appeal in its breach of contract action against Langley.

### 2. Breach of Contract

In the City's breach of contract claim, it alleged that Langley agreed to indemnify and defend it against any and all claims for damages and liability for injury to or death of persons. It asserts this contractual obligation included duties to indemnify and defend against claims of negligence such as the Estate's wrongful death action.

[19] Given our resolution of the appeal with respect to the wrongful death claim, the City's claim as it pertains to an alleged duty to indemnify is, strictly speaking, moot. Mootness refers to events occurring after the filing of a suit which eradicate the requisite personal interest in the dispute's resolution that existed at the beginning of the litigation.[74] Because the Estate has lost its wrongful death action, there is nothing for Langley to indemnify.

Here, the Agreement stated that Langley "shall pay the reasonable cost of defending lawsuits resulting therefrom, including, but not limited to, reasonable attorneys fees, court costs and any judgment." Because the City seeks under the duty to defend to recover from Langley the costs incurred by the City in defending itself in the Estate's action that was ultimately unsuccessful, that aspect of its breach of contract claim is not rendered moot by the judgment against the Estate in its wrongful death action.

---

[74] *Chaney v. Evnen*, 307 Neb. 512, 949 N.W.2d 761 (2020).

The provision at issue is as follows:

[Langley] agrees that it shall indemnify, defend and hold harmless, the City, its officers, agents, employees and administrators from and against any and all claims for damage and liability for injury to or death of persons; and for damage to or destruction of property occurring during and arising out of the acts or omission of [Langley], its employees and/or agents with regard to [Langley's] filming; and shall pay the reasonable cost of defending lawsuits resulting therefrom, including, but not limited to, reasonable attorneys fees, court costs and any judgment awarded to a third party as the result of such suit. In accordance with the foregoing, [Langley] also agrees to indemnify, defend and hold harmless the City from and against all claims related to intellectual property claims arising out of [Langley's] filming activities.

The City argues that the broad language of "indemnify, defend and hold harmless, the City, its officers, agents, employees and administrators from and against any and all claims for damage and liability for injury to or death of persons" includes defending the City against claims it was negligent, such as the wrongful death action brought by the Estate.

[20-22] However, as the district court noted, there is a presumption against any intention to indemnify against an indemnitee's own negligence.[75] Clauses indemnifying the indemnitee for the indemnitee's own negligence are strictly construed against the claimant.[76] To ensure that the parties truly intended to indemnify for the indemnitee's negligence, a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from the indemnitee's own

---

[75] 42 C.J.S. *Indemnity* § 20 (2017).

[76] 41 Am. Jur. 2d *Indemnity* § 16 (2015). See, also, 8 Richard A. Lord, A Treatise on the Law of Contracts by Samuel Williston § 19:19 (4th ed. 2010); 42 C.J.S. *supra* note 75.

negligence unless the intention of the parties is clearly and unambiguously expressed.[77]

[23,24] The intention to indemnify the indemnitee for the indemnitee's own negligence need not be stated through a specific reference to indemnification against liability for negligence; but, if not so expressed, it must otherwise clearly appear from the language used or from a determination that no other meaning could be ascribed to the contract such that the court is firmly convinced that such interpretation reflects the intention of the parties.[78] To determine if the contract indemnifies against an indemnitee's own negligence, we generally first examine whether the express language covers the indemnitee's own negligence and, second, whether the contract contains clear and unequivocal language that it was the parties' intention to cover the indemnitee's own negligence.[79]

Thus, in *Oddo v. Speedway Scaffold Co.*,[80] we held that a provision to indemnify against all conduct "'including active, passive, primary or secondary,'" while excluding indemnification for "'wilful misconduct,'" expressed an intention to indemnify for negligence clearly and unequivocally, even though it did not contain the word "negligence." Likewise, we found in *Kuhn v. Wells Fargo Bank of Neb.*[81] that an indemnification clause of a lease clearly and unequivocally expressed the parties' intention to indemnify the indemnitee for the indemnitee's own negligence. The clause at issue provided:

---

[77] See, *Anderson v. Nashua Corp.*, 251 Neb. 833, 560 N.W.2d 446 (1997); *Oddo v. Speedway Scaffold Co.*, 233 Neb. 1, 443 N.W.2d 596 (1989). See, also, *id.*

[78] See 42 C.J.S. *supra* note 75.

[79] See *Anderson v. Nashua Corp., supra* note 77.

[80] *Oddo v. Speedway Scaffold Co., supra* note 77, 233 Neb. at 9, 443 N.W.2d at 602. See, also, *Federated Serv. Ins. Co. v. Alliance Constr.*, 282 Neb. 638, 805 N.W.2d 468 (2011).

[81] *Kuhn v. Wells Fargo Bank of Neb.*, 278 Neb. 428, 771 N.W.2d 103 (2009).

"With the exception of those claims arising out of [lessor's] *gross negligence* or willful misconduct, [lessee] shall indemnify [lessor] and hold it harmless from any claim or damage arising out of any injury, death or property damage occurring in, on or about the Property, the Building, the Leased Premises and appurtenances thereto to [lessee] or an employee, customer or invitee of [lessee]."[82]

We explained that the language required the lessee to indemnify the lessor for "something."[83] Looking at the provision as a whole and giving it a reasonable instruction, we reasoned that if "any injury" did not include the indemnitee's negligence, it would have been unnecessary to specifically exclude gross negligence.[84] We held that because it placed a duty to indemnify for any injury other than gross negligence, it clearly still included negligence that was "less than gross."[85]

In contrast, in *Anderson v. Nashua Corp.*,[86] we held language that the indemnitor would protect the indemnitee against "'all risks and from any claims that may arise out of or pertain to the performance of such work,'" neither constituted express language covering the indemnitee's own negligence nor clear and unequivocal language that it was the parties' intention to cover the indemnitee's own negligence. Similarly, in *Omaha P. P. Dist. v. Natkin & Co.*,[87] we held that a contract to protect the indemnitee from "'claims for damages for personal injury, including wrongful death, as well as claims for property damages, which may arise from operations'" was, at

---

[82] *Id.* at 431, 771 N.W.2d at 109.

[83] *Id.* at 440, 771 N.W.2d at 115.

[84] *Id.* at 441, 771 N.W.2d at 115.

[85] *Id.* at 441, 771 N.W.2d at 116.

[86] *Anderson v. Nashua Corp., supra* note 77, 251 Neb. at 840, 560 N.W.2d at 450.

[87] *Omaha P. P. Dist. v. Natkin & Co.*, 193 Neb. 518, 520, 227 N.W.2d 864, 866 (1975).

best, ambiguous as to whether the parties intended to indemnify the indemnitee from its own negligence. Thus, it did not overcome the presumption against any intention to indemnify against an indemnitee's own negligence.

[25] The language of the Agreement is similar to the language in *Anderson* and *Omaha P. P. Dist.* that we found failed to clearly and unambiguously express an intention to indemnify the indemnitee for the indemnitee's own negligence. The express language does not cover the indemnitee's own negligence, and the contract does not contain clear and unequivocal language that it was the parties' intention to cover the indemnitee's own negligence. While the reference in the Agreement to "any and all claims for damage and liability for injury to or death of persons" is facially broad, standing alone, general, broad, and seemingly all-inclusive language is simply not sufficient to impose liability for the negligence of the indemnitee.[88]

And there is no other provision in the Agreement, such as was present in *Kuhn*, excluding a higher degree of negligence or otherwise clearly expressing an intention to indemnify the City for its own negligence.[89] To the contrary, albeit specified for property claims and separated by a semicolon from the broad reference to "any and all claims for damage and liability for injury to or death of persons," the Agreement refers to claims "during and arising out of the acts or omission of [Langley], its employees and/or agents with regard to [Langley's] filming."

There was not clear and unequivocal language in the Agreement overcoming the presumption that the parties did not intend that the indemnitee would be indemnified for a loss occasioned by the indemnitee's own negligence. Langley was not obligated to indemnify the City in the event the Estate's claim was successful, because the wrongful death

---

[88] 42 C.J.S. *supra* note 75.

[89] See *Kuhn v. Wells Fargo Bank of Neb., supra* note 81.

claim, relying on allegations of negligence against the City, was outside the Agreement. Because the claim was outside the Agreement, Langley did not have a duty to defend the City against the action. Accordingly, we affirm the district court's dismissal of the City's third-party breach of contract claim.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Affirmed.

Miller-Lerman, J., concurring in part, and in part dissenting.

As an initial matter, consistent with my dissenting views in *Moser v. State*, 307 Neb. 18, 948 N.W.2d 194 (2020); *Edwards v. Douglas County*, 308 Neb. 259, 953 N.W.2d 744 (2021); and *Williams v. State*, 310 Neb. 588, 967 N.W.2d 677 (2021), I reiterate that I continue to dissent from the court's many holdings regarding the intentional tort exceptions to the waiver of sovereign immunity pertaining to battery, see Neb. Rev. Stat. § 81-8,219(4) (Cum. Supp. 2020) (State Tort Claims Act) and Neb. Rev. Stat. § 13-910(7) (Reisue 2012) (Political Subdivisions Tort Claims Act), including that these provisions apply if there is an assault or battery anywhere in the picture and regardless of the assailant's employment status. Also, although I recognize that both the State Tort Claims Act and the Political Subdivisions Tort Claims Act limit economic exposure, I continue to believe that it is inappropriate for this court to directly consider the outcome's effect on "public fisc" in rendering its interpretation of these statutes. Nevertheless, I am bound to apply this court's holdings unless or until they are corrected by, inter alia, the Legislature. See L.B. 54, 107th Leg., 1st Sess. (2021).

I concur in the result. Unlike some previous cases which were decided on preliminary motions, this matter went to trial. The district court found as follows: "The elements of a

battery have clearly been met when this Court applies the elements to the evidence in this case." That is, the district court found that the City's officers had committed the intentional tort of battery, the death arose from the battery, and the action was barred by the sovereign immunity retained by the City under the intentional tort exception found in § 13-910(7). Thus, the district court did not have jurisdiction of the wrongful death claim.

Assuming transferred intent applied and based on earlier cases, the district court concluded that the Estate's claims arose out of the battery and were barred by sovereign immunity. Like the district court, the majority opinion rejects the Estate's arguments asserting that the wrongful death claim did not arise out of a battery. The majority affirms the district court's findings that the claims arose from the battery and that the action is barred by sovereign immunity. Given the absence of jurisdiction, I find it puzzling that the majority opinion nevertheless proceeds to a negligence analysis and writes extensively about "privilege," which the district court did not consider in its sovereign immunity analysis. If there is no jurisdiction, why consider the merits?

"Battery is an intentional tort. '. . . [T]here is no such thing as a negligent battery.' 1 DOBBS, LAW OF TORTS § 26 at 51 (2001)." *District of Columbia v. Chinn*, 839 A.2d 701, 706 (2003). In this case, the district court did not base its decision on privilege so neither should we. As the City urges, the district court found the claims arose from the battery; as the City further states, privilege is "immaterial" and the City is shielded by sovereign immunity. Brief for appellee the City at 17. I agree.

The district court found, based on evidence, that it lacked jurisdiction. I respectfully suggest that by proceeding with its negligence analysis, the majority opinion has conflated its consideration of jurisdiction with the merits of the negligence claim, something which should be avoided. See *Florida Highway Patrol v. Jackson*, 288 So. 3d 1179 (Fla. 2020).

Instead, my focus remains on the district court's finding that the action arose from the battery and is barred by sovereign immunity, and I note the significance of this finding. "[T]he *presence of sovereign immunity* does not render the State's actions nontortious (it simply means that the State has *not consented to suit* in its courts with regard to certain claims)." *Wallace v. Dean*, 3 So. 3d 1035, 1045 (Fla. 2009) (emphasis in original). The State's actions are not nonliable. See *id*. The presence of sovereign immunity is distinct from lack of liability. See *id*.

So with respect to the preclusive effect, if any, of the district court's finding as affirmed by this court that the claims arose from the battery committed by the City's officers, I note that it has been observed that immunity under one statute does not necessarily indicate that an action will be barred under another statute with a differing scheme. See *Davis v. Harrod*, 407 F.2d 1280 (D.C. Cir. 1969).

In this case, the City's officers responded to a robbery at a fast-food restaurant, fired 36 bullets, and killed a member of a film crew. As the City urged, the trial court found that the City's officers had committed a battery and the majority of this court agrees. So under current Nebraska law, the City is immune from suit in this case. But the presence of sovereign immunity under § 13-910(7) in this case does not necessarily render the City's actions nontortious for other purposes.